Nos. 21-cv-7532 (Lead); 21-cv-7585; 21-cv-7961; 21-cv-7962; 21-cv-7966; 21-cv-7969; 21-cv-8034; 21-cv-8042; 21-cv-8049; 21-cv-8055; 21-cv-8139; 21-cv-8258; 21-cv-8271; 21-cv-8538; 21-cv-8557; 21-cv-8566 (Consolidated)

---

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

In re PURDUE PHARMA L.P., *et al.*, Debtors.

---

WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE, *et al*., Appellants,

v.

PURDUE PHARMA L.P., *et al.*, Appellees.

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF OF APPELLANT, WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE**

---

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
WENDY COX
BETH A. LEVENE
MELANIE D. HENDRY
SUMI K. SAKATA
Trial Attorneys

Department of Justice
Executive Office for
  United States Trustees
441 G Street, NW, Suite 6150
Washington, DC 20530
Tel: (202) 307-1399

WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
PAUL K. SCHWARTZBERG
BENJAMIN J. HIGGINS
BRIAN MASUMOTO
ANDREW VELEZ-RIVERA
Trial Attorneys

Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY 10014
Tel: (212) 510-0500

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF APPELLATE JURISDICTION .................................................................. 3

STATEMENT OF THE ISSUES................................................................................................. 4

STANDARD OF REVIEW ......................................................................................................... 5

STATEMENT OF THE CASE..................................................................................................... 5

I.     Statutory and legal framework.................................................................................... 5

    A.    Bankruptcy relief under chapter 11 is limited by the Bankruptcy Code....................... 5

    B.    The bankruptcy discharge in non-asbestos chapter 11 cases does not extend to non-debtors............................................................................................................................. 7

    C.    The role of the United States Trustee ............................................................................ 8

II.    Statement of the Facts ................................................................................................. 8

    A.    Purdue—but not the Sackler Family—files for chapter 11 bankruptcy relief to resolve their respective liabilities relating to the opioid epidemic. ........................................... 8

    B.    The confirmation proceedings. ................................................................................... 10

        1.    The bankruptcy court sets a deadline for Purdue's creditors to file claims against Purdue—but not the Sackler Family or other non-debtors. ..................................... 10

        2.    Purdue's disclosure statement provides insufficient information about the Non-Debtor releases................................................................................................................ 10

        3.    Publication notice of the confirmation hearing also provides insufficient information about the termination of non-debtors' rights against the Sackler Family and other non-debtors. ............................................................................................... 11

        4.    Purdue's proposed plan would release hundreds of non-debtor parties under its settlement with the Sackler Family allowing payment over nine to ten years and requiring a new claims process for victims to get paid.......................................... 11

        5.    The United States Trustee objects to the proposed plan on constitutional and statutory grounds; others also object; 2,683 victims who filed opioid-related personal injury claims against Purdue vote to reject the plan; and over 70,000 (51%) victims do not vote.................................................................................................. 14

        6.    Purdue repeatedly amends its proposed plan but keeps the Non-Debtor releases to which the United States Trustee maintains his constitutional and statutory objections. .................................................................................................................. 15

        7.    The bankruptcy court provisionally confirms Purdue's plan................................. 15

    C.    The bankruptcy court enters the Confirmation Order and a modified bench ruling... 21

    D.    The bankruptcy court issues the Advance Order prior to the Confirmation Order. ... 22

    E.    The United States Trustee appeals and seeks a stay, as do others. ............................. 23

i

SUMMARY OF THE ARGUMENT ........................................................................ 23

ARGUMENT ........................................................................................................ 25

I.    The Plan's extinguishment of non-debtors' claims against other non-debtors is unconstitutional.............................................................................................. 25

    A.    The Plan's extinguishment of non-debtors' direct claims against other non-debtors violates the Due Process Clause. ................................. 25

        1.    Litigation rights are property rights within the Due Process Clause. ..................... 25

        2.    The Plan deprives opioid victims of their claims without their consent................. 26

        3.    The Plan deprives opioid victims of their claims without adequate notice. ........... 28

        4.    The Plan deprives opioid victims of their claims without compensation. .............. 30

    B.    The Bankruptcy Clause does not authorize taking opioid victims' independent non-bankruptcy claims against the Sackler Family and other non-debtors. ..................... 31

    C.    The bankruptcy court lacked constitutional authority to extinguish the non-debtors' claims against the Sackler Family and other non-debtors. ........................................... 33

II.    The bankruptcy relief bestowed upon the Sackler Family and other non-debtors violates the Bankruptcy Code.............................................................................................. 38

    A.    The Bankruptcy Code does not authorize extinguishing non-debtors' claims against non-debtors in non-asbestos cases. ............................................. 38

    B.    The Plan grants the Sackler Family and other non-debtors greater relief than they could lawfully obtain if they became debtors and obtained a bankruptcy discharge. 41

    C.    Second Circuit precedent does not authorize the extinguishment of these claims. .... 42

        1.    Direct vs. derivative claims.................................................................. 42

        2.    The Plan terminates non-debtors' direct claims against the Sackler Family and other non-debtors. ........................................................................................... 45

        3.    *Metromedia* does not authorize the release of liabilities of the Sackler Family and other non-debtors. ..................................................................... 50

        4.    *Quigley* does not authorize the Non-Debtor releases............................... 53

        5.    No other binding Second Circuit opinion authorizes the Non-Debtor releases....... 56

III.    Because the Non-Debtor releases are improper, the bankruptcy court abused its discretion in issuing the related orders. ........................................................................... 57

CONCLUSION.................................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Zarnel (In re Zarnel)*,
  619 F.3d 156 (2d Cir. 2010)...........................................................................................8

*In re Aegean Marine Petroleum Network Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) ....................................................................38, 51

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997).............................................................................................27, 28

*Ass'n v. Gibbons*,
  455 U.S. 457 (1982)...................................................................................................31

*Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999) (Stevens, J., dissenting) ..............................................................6

*Barrett v. United States*,
  689 F.2d 324 (2d Cir. 1982)......................................................................................25

*In re Bellingham Ins. Agency, Inc.*,
  702 F.3d 553 (9th Cir. 2012), *aff'd, Exec. Benefits Ins. Agency v. Arkison*, 573
  U.S. 25 (2014).........................................................................................................37

*In re Bernard L. Madoff Inv. Secs. LLC*,
  740 F.3d 81 (2d Cir. 2014)................................................................42, 43, 44, 56, 57

*Blixseth v. Credit Suisse*,
  961 F.3d 1074 (9th Cir. 2020) ..................................................................................39

*Bullard v. Blue Hills Bank*,
  575 U.S. 496 (2015)....................................................................................................3

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001)..................................................................................................48

*Cent. Va. Cmty. Coll. v. Katz*,
  546 U.S. 356 (2006)..................................................................................................32

*In re Charter Commc'ns*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ........................................................................6

*Chartschlaa v. Nationwide Mut. Ins. Co.*,
  538 F.3d 116 (2d Cir. 2008)......................................................................................41

*Commonwealth v. Purdue Pharma, L.P.*,
No. 1884CV01808, 2019 WL 5617817 (Mass. Super. Oct. 8, 2019)....................................46

*Commonwealth v. Purdue Pharma, L.P.*,
No. 1884CV01808, 2019 WL 6497887 (Mass. Super. Nov. 6, 2019)..............................45, 46

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000)..................................................................................................40

*Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi. R.I. & P. Ry. Co.*,
294 U.S. 648 (1935)...............................................................................................................31

*Corbett v. Manson*,
903 A.2d 69 (Pa. Cmwlth. 2006) .....................................................................................45, 47

*Czyzewski v. Jevic Holdings Corp.*,
137 S. Ct. 973 (2017)...............................................................................................39, 50, 51

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
438 U.S. 59 (1978) (Stewart, J., concurring) ..................................................................25, 28

*Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm.)*,
619 B.R. 38 (S.D.N.Y. 2020)..................................................................................................9

*Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
829 F.3d 135 (2d Cir. 2016).......................................................................................25, 26, 30

*Exec. Benefits Ins. Agency v. Arkison*,
573 U.S. 25 (2014)..................................................................................................................5

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017).......................................................................................................5

*Feld v. Zale Corp. (In re Zale Corp.)*,
62 F.3d 746 (5th Cir. 1995) .............................................................................................39, 54

*In re Fisher Island Invs., Inc.*,
778 F.3d 1172 (11th Cir. 2015) .............................................................................................37

*Galas v. Lending Co.*,
No. 12-01265, 2013 WL 308745 (D. Ariz. Jan. 25, 2013) ...................................................45

*In re Glo-Tex Intern.*,
No. 07-06449, 2010 WL 4916574 (Bankr. D.S.C. Nov. 30, 2010) ..................................45, 48

*In re Glob. Technovations Inc.*,
694 F.3d 705 (6th Cir. 2012) .................................................................................................37

*Granfinanciera, S.A. v. Nordberg,*
    392 U.S. 33 (1989) ............................................................................35

*Hartman v. Sackler,*
    Case No. 21-02001, Dkt. 1 (E.D. Pa. filed Apr. 30, 2021) ................................47, 48

*Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters. (In re Briscoe Enters.),*
    994 F.2d 1160 (5th Cir. 1993) ........................................................................7

*Hebb v. Greens Worldwide, Inc.,*
    No. 06-4368, 2007 WL 2935811 (Mass. Super. Sept. 17, 2007) ...........................46

*Heden v. Johnson & Johnson,*
    No. 19-00586 (D.R.I. filed Nov. 12, 2019) ...........................................................47

*Hickey v. Purdue Pharma, et al.,*
    Case No. 19-11806 (D. Mass. filed Aug. 22, 2019) ..............................................47

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas*
    *Petroleum, Inc.),*
    522 F.3d 575 (5th Cir. 2008) ........................................................................44

*Huebner v. Midland Credit Mgmt., Inc.,*
    897 F.3d 42 (2d Cir. 2018) ...........................................................................5

*Jama v. Immigr. & Customs Enf't,*
    543 U.S. 335 (2005) ...................................................................................50

*In re Johns-Manville Corp.,*
    517 F.3d 52 (2d Cir. 2008), *rev'd and remanded on other grounds sub nom.*
    *Travelers Indem. Co. v. Bailey,* 557 U.S. 137 (2009) ......................32, 33, 43, 55, 56

*Joseph Gen. Contracting, Inc. v. Couto,*
    119 A.3d 570 (Conn. 2015) .........................................................................45

*In re Kirwan Offs. S.a.r.l.,*
    592 B.R. 489 (S.D.N.Y. 2018), *aff'd on other grounds sub nom. In re Kirwan*
    *Offs. S.a.R.L.,* 792 F. App'x 99 (2d Cir. 2019) .............................................37, 38

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ...................................................................................50

*Kothe v. Smith,*
    771 F.2d 667 (2d Cir. 1985) .........................................................................27

*Law v. Siegel,*
    571 U.S. 415 (2014) ...............................................................................39, 40

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ................................................................................. 50

*Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
478 U.S. 501 (1986) ................................................................................. 26

*Loveridge v. Hall (In re Renewable Energy Dev. Corp.)*,
792 F.3d 1274 (10th Cir. 2015), *as amended on denial of reh'g* (July 28,
2015) (Gorsuch, J.) ................................................................................. 37

*In re Lowenschuss*,
67 F.3d 1394 (9th Cir. 1995) ................................................................... 39

*Luckett v. Bure*,
290 F.3d 493 (2d Cir. 2002) ..................................................................... 33

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
837 F.2d 89 (2d Cir. 1988) ................................................................ 43, 56

*Madeira v. Affordable Hous. Found., Inc.*,
469 F.3d 219 (2d Cir. 2006) ..................................................................... 38

*Map to Health v. AmerisourceBergen Drug Corp.*,
No. 21-45093 (N.D. Ohio filed July 15, 2021) ........................................ 48

*Martin v. Wilks*,
490 U.S. 755 (1989) ................................................................................. 26

*Mercy House Teen Challenge v. AmerisourceBergen Drug Corp.*,
No. 18-46070, Dkt. 27 (N.D. Ohio filed Mar. 15, 2019) ......................... 48

*In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) ....................................................................... 38

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005) ................................................. 40, 50, 51, 52, 53

*In re Millennium Lab Holdings II, LLC.*,
945 F.3d 126 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v.
Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020) ...................... 36

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) ................................................................................. 28

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982) (Rehnquist, J., concurring) ....................................... 33

*N.Y. State Nat'l Org. for Women v. Pataki*,
  261 F.3d 156 (2d Cir. 2001)..................................................................................25

*In re Opioid Litig.*,
  Index No. 400000/2017, 2019 N.Y. Misc. LEXIS 3324 (N.Y. Sup. Ct. June
  21, 2019) ...............................................................................................................46

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)...........................................................................26, 27, 28, 56

*In re Ortiz*,
  665 F.3d 906 (7th Cir. 2011) ................................................................................37

*Perez v. Everett (In re Perez)*,
  30 F.3d 1209 (9th Cir. 1994) .............................................................................3, 57

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)...............................................................................................27

*Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
  721 F.3d 54 (2d Cir. 2013)....................................................................................44

*Purdue*,
  Adv. No. 19-08289 .....................................................................................47, 48, 49

*In re Quigley Co.*,
  676 F.3d 45 (2d Cir. 2012)............................................22, 36, 53, 54, 55, 56

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)...............................................................................................40

*Rhodes v. Rhodes Techs., Inc.*,
  No. 19-cv-00885 (M.D. Tenn. filed Oct. 5, 2019)................................................47

*Richards v. Jefferson Cty., Ala.*,
  517 U.S. 793 (1996)...............................................................................................26

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp.,
  Inc.)*,
  960 F.2d 285 (2d Cir. 1992)..................................................................................56

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
  884 F.2d 688 (2d Cir. 1989)..................................................................................42

*State v. Purdue Pharma L.P.*,
  No. PC-2018-4555, 2019 R.I. Super. LEXIS 95 (Super. Ct. Aug. 16, 2019).........46

*Stern v. Marshall,*
    564 U.S. 462 (2011)..................................................................4, 5, 21, 24, 33, 34, 35, 36

*Matter of Tex. Extrusion Corp.,*
    844 F.2d 1142 (5th Cir. 1988) ..............................................................................4

*Matter of Tex. Extrusion Corp.,*
    844 F.2d at 115 ...................................................................................................57

*Tilley v. Purdue Pharma L.P.,*
    No. 19-00566 (S.D. W. Va. filed Aug. 2, 2019) ....................................................47

*Travelers Indem. Co. v. Bailey,*
    557 U.S. 137 (2009) .............................................................................34, 39, 43, 44

*In re Tronox Inc.,*
    855 F.3d 84 (2d Cir. 2017).........................................................................42, 43, 44, 57

*Trulis v. Barton,*
    107 F.3d 685 (9th Cir. 1995) ..............................................................................34

*U.S. Aid Funds, Inc. v. Espinosa,*
    559 U.S. 260 (2010)..............................................................................................7

*United States v. Ward Baking Co.,*
    376 U.S. 327 (1964)............................................................................................27

*Usery v. Turner Elkhorn Mining Co.,*
    428 U.S. 1 (1976).................................................................................................28

*In re VeroBlue Farms USA, Inc.,*
    6 F.4th 880 (8th Cir. 2021) .................................................................................50

*In re W.R. Grace Co.,*
    13 F.4th 279 (3d Cir.2021) ..................................................................................53

*In re We. Real Estate Fund Inc.,*
    922 F.2d 592 (10th Cir. 1990) ............................................................................39

*In re Wellness Int'l Network, Ltd. v. Sharif,*
    575 U.S. 665 (2015)............................................................................................33

*Yukos Cap. S.A.R.L. v. Feldman,*
    977 F.3d 216 (2d Cir. 2020)..................................................................................5

**Statutes**

11 U.S.C. § 101(5) ...................................................................................................16, 17

11 U.S.C. § 105(a) .................................................................................22, 40

11 U.S.C. § 109 ..............................................................................................7

11 U.S.C. § 307 ..............................................................................................8

11 U.S.C. § 341 ..............................................................................................7

11 U.S.C. § 363 ............................................................................................30

11 U.S.C. §§ 501-503 ..............................................................................33, 34

11 U.S.C. § 521 ..............................................................................................7

11 U.S.C. § 521(a) ........................................................................................41

11 U.S.C. § 523 ............................................................................................40

11 U.S.C. §§ 523(a)(2), (4), (6) ...........................................................7, 17, 42

11 U.S.C. § 524 ......................................................................................40, 41

11 U.S.C. § 524(a) ...............................................................................7, 38, 40

11 U.S.C. § 524(e) ...........................................................................7, 21, 38, 40

11 U.S.C. § 524(g) ..................................................4, 7, 38, 39, 40, 53, 54, 55

11 U.S.C. § 524(g)(2)(B)(i) ..........................................................................39

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ...........................................................55

11 U.S.C. § 524(g)(4)(A)(ii) ...........................................................39, 53, 54, 55

11 U.S.C. § 524(g)(4)(B)(i) ..........................................................................55

11 U.S.C. § 541(a) ........................................................................................41

11 U.S.C. § 542 ............................................................................................41

11 U.S.C. § 727 ..............................................................................................7

11 U.S.C. § 1101(2) ......................................................................................22

11 U.S.C. §§ 1101 *et seq* ................................................................................5

11 U.S.C. § 1104 ............................................................................................7

11 U.S.C. § 1108 ............................................................................................7

11 U.S.C. § 1109 .................................................................................................7

11 U.S.C. § 1112 .................................................................................................7

11 U.S.C. § 1122 .................................................................................................6

11 U.S.C. § 1123(a)(5) .......................................................................................22

11 U.S.C. § 1123(b)(6) ...........................................................................22, 40, 41

11 U.S.C. § 1125(a) .......................................................................................6, 10

11 U.S.C. § 1125(b) .................................................................................6, 10, 57

11 U.S.C. § 1126 ...............................................................................................26

11 U.S.C. § 1126(a) .............................................................................................6

11 U.S.C. § 1126(c) .............................................................................................6

11 U.S.C. § 1126(d) .............................................................................................6

11 U.S.C. § 1126(f) ............................................................................................11

11 U.S.C. § 1126(g) ...........................................................................................11

11 U.S.C. § 1128(b) .............................................................................................6

11 U.S.C. § 1129 ........................................................................................3, 6, 7

11 U.S.C. § 1129(a) .............................................................................................6

11 U.S.C. § 1129(a)(1) .......................................................................................41

11 U.S.C. § 1129(a)(7) ..................................................................................6, 41

11 U.S.C. § 1129(a)(8)(A) ...................................................................................6

11 U.S.C. § 1141(d) .......................................................................................7, 41

11 U.S.C. § 1141(d)(1)(A) .............................................................................7, 38

18 U.S.C. § 1961, *et seq*...................................................................................48

28 U.S.C. §§ 157(a) and (b), and 1334(a) ...........................................................3

28 U.S.C. § 157(b) ......................................................................................21, 35

28 U.S.C. § 157(b)(2) ..........................................................................................5

28 U.S.C. § 158(a)(1) ...............................................................................................3

28 U.S.C. § 158(c) ....................................................................................................5

28 U.S.C. § 158(c)(2) ...............................................................................................4

28 U.S.C. §§ 581-589 ...............................................................................................8

28 U.S.C. § 586(a)(3)(B) ..........................................................................................8

Bankruptcy Reform Act of 1994 § 111(b), 108 Stat. 4117 (1994) ........................39

Mass. Gen. Laws ch. 93A .......................................................................................46

N.Y. Gen. Bus. Law § 349(h) .................................................................................46

Pennsylvania Unfair Trade Practices Act ...............................................................47

**Other Authorities**

7 Collier on Bankruptcy (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) .......................5, 41

Asbestos Injury Compensation, GAO Report No. 11-819 ..................................39, 55

Fed. R. Bankr. P. 8002(a)(3) ....................................................................................4

Fed. R. Bankr. P. 3003(c)(3) ..................................................................................10

Fed. R. Bankr. P. 8018.1 ..........................................................................................5

Fed. R. Civ. P. 23 ...................................................................................................56

H.R. Rep. No. 595, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.C.C.A.N. 5963
(1978) .................................................................................................................8

Restatement (Second) of Torts ...............................................................................47

U.S. Const. amend. V ........................................................................................25, 26

U.S. Const. amend. VII ...........................................................................................35

U.S. Const. art. I ...............................................................................................24, 34

U.S. Const. art. I, § 8, cl. 4 ............................................................................2, 4, 24, 31, 32

U.S. Const. art. III ..........................................................................................33, 34, 35, 36

## PRELIMINARY STATEMENT

This appeal arises from one of the largest mass tort and public health crises in history. The United States Trustee filed this appeal and objected to the Plan because its non-consensual third-party releases violate the Constitution and are not authorized under the Bankruptcy Code. Like other bankruptcy plans, the Plan creates a comprehensive framework for resolving and paying claims asserted by Purdue's creditors against Purdue. But the Plan goes far beyond reordering the rights of Purdue and its creditors by also shielding a broad swath of hundreds, if not thousands, of Sackler Family members and other non-debtors, including those still unborn, from all civil opioid-related suits—including those for, among other things, fraud and other liabilities excepted from discharge in an individual's bankruptcy case—over strenuous objections by victims, states, and other creditors.

Purdue's Plan strips opioid victims of their direct claims against the Sackler Family and other non-debtors for their own misconduct, in violation of the victims' constitutional rights and the Bankruptcy Code. This blanket civil immunity protects the Sackler Family and related parties from all direct liability to their victims if the victim also happens to hold a claim against Purdue, whether filed or not. Claims that have been brought against individual Sackler Family members and other non-debtor defendants alleging direct liability based on their own conduct include, but are not limited to, product liability, wrongful death, negligence, negligent misrepresentation, fraud, fraudulent concealment, deceit and other willful misconduct, unjust enrichment, public nuisance, and claims under state consumer protection and controlled substances laws. Because of the bankruptcy court's nationwide preliminary injunction, no party was allowed to file any new litigation against the Sackler Family or related non-debtors since October 11, 2019. Thus, the full universe of the direct claims against the Sackler Family remains unknown and uncounted.

The Plan violates the victims' constitutional due process rights in several ways. First, it extinguishes their direct claims against the Sackler Family without their consent. Second, it

1

extinguishes victims' direct claims against the Sackler Family despite the absence of constitutionally adequate notice.  Third, the Plan prohibits them from being compensated on the extinguished claims against the Sackler Family and other non-debtors; they only receive any compensation on account of their claims against Purdue.

The Plan also transgresses constitutional limits on what bankruptcy courts may do. Because it terminated direct non-bankruptcy claims held by non-debtor victims against other non-debtors, it falls outside the powers conferred by the Bankruptcy Clause.  The bankruptcy court also lacked constitutional authority to extinguish state law claims between private parties that arise independently of Purdue's bankruptcy filing and are not resolved by a ruling on the victims' claims against Purdue.

These harms were inflicted through a non-consensual non-debtor or "third-party" release not sanctioned by statute and expressly prohibited by no fewer than three circuit courts of appeal. The Bankruptcy Code does not authorize extinguishing non-debtors' claims against non-debtors in non-asbestos cases.  Nor has the Second Circuit ever authorized third-parties releases of this scope.

Under the Plan, the victims' loss is the Sackler Family's gain.  It gives the Sackler Family benefits available only to bankruptcy debtors without requiring them to satisfy the obligations the Bankruptcy Code imposes in return.  First, the Plan allows the Sackler Family to ignore the Code's financial disclosure requirements.  Second, it allows them to devote far less of their assets than debtors must.  Third, it releases them from fraud and willful and malicious injury claims, which debtors have no right or ability to discharge under the Bankruptcy Code.

These releases do real harm.  The victims are prohibited from commencing or pursuing lawsuits to collect anything from the Sackler Family for their wrongdoing.  Hundreds of lawsuits were brought against the Sackler Family and other non-debtors before Purdue filed its bankruptcy case and the bankruptcy court enjoined those and new lawsuits, which injunction became permanent under the Plan.  And while the victims may also have other opioid claims against Purdue that are being paid under the Plan from the proceeds of Purdue's settlement with

the Sackler Family, victims are prohibited from any recovery under the Plan on their direct claims against the Sackler Family that they have brought, or could bring, and are being forced to relinquish.

The orders extinguishing those rights violated both the Constitution and the Bankruptcy Code.  The Debtors, as plan proponents, bore the burden of proving the Plan was constitutionally sound and in accordance with the law.  They did not meet that burden.  The orders on appeal merit reversal.

## STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a)(1), which grants district courts jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges.

The bankruptcy court had jurisdiction over the chapter 11 bankruptcy cases of debtors Purdue Pharma L.P. and its related entities (collectively, "Purdue" or "Debtors") under 28 U.S.C. §§ 157(a) and (b), and 1334(a).  The bankruptcy court's final order confirming the Debtors' Twelfth Amended Joint Plan of Reorganization ("Plan") under 11 U.S.C. § 1129 was entered on September 17, 2021 ("Confirmation Order").  App.1-487.[1]  *See Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015) (holding that plan confirmation "alters the status quo and fixes the rights and obligations of the parties" for purposes of finality analysis).

The bankruptcy court's order approving the Debtors' disclosure statement for the Plan that was eventually confirmed (seven iterations later) was entered on June 3, 2021; that interlocutory order merged into the final confirmation order for purposes of appeal ("Disclosure Order").  App.647-945.  *See Perez v. Everett (In re Perez)*, 30 F.3d 1209, 1217 (9th Cir. 1994) ("[T]he confirmation order—not the disclosure order—triggers the deadline for notices of appeal

---

[1]  "App.___" refers to the United States Trustee's Appendix submitted with this brief.  Unless otherwise indicated, "Dkt." refers to the docket numbers in bankruptcy court, Case No. 19-23649.  Where applicable, cited page numbers are to the ECF pagination at the top of the referenced document.

on [disclosure statement issues]."); *Matter of Tex. Extrusion Corp.*, 844 F.2d 1142, 115 (5th Cir. 1988) (holding "approval of a disclosure statement is only one step in the process" of plan confirmation).  And the bankruptcy court's order approving the Debtors' motion for advance funding of various entities in anticipation of, and prior to, consummation of the Plan was entered on September 15, 2021 ("Advance Order").  App.1228-1233.

The government timely filed notices of appeal of the bankruptcy court's orders under 28 U.S.C. § 158(c)(2) and Fed. R. Bankr. P. 8002(a)(3) on September 15, 2021.  Dkt. 3776, 3777. The government timely filed an amended notice of appeal of the Confirmation Order, after it was entered on the docket, on September 21, 2021.  Dkt. 3799.

## STATEMENT OF THE ISSUES

1.      Did the bankruptcy court err by entering an order confirming the Plan and approving the releases of the Sackler Family and other non-debtors from claims belonging to opioid victims, states, and the other releasing parties ("Non-Debtor releases")?

2.      Does the bankruptcy court have legal authority or inherent equitable power to impose Non-Debtor releases other than those that meet all of the requirements of section 524(g) under the Bankruptcy Code?

3.      Did the bankruptcy court's order violate the victims' and the other releasing parties' constitutional rights by extinguishing their claims without their consent and without compensation or by failing to provide adequate notice and hearing?

4.      Did the bankruptcy court exceed its constitutional authority under *Stern v. Marshall*, 564 U.S. 462 (2011), by extinguishing the victims', the states' and the other releasing parties' claims against other non-debtors?

5.      Did the bankruptcy court exceed its power under the Bankruptcy Clause of the Constitution or its jurisdiction by imposing the Non-Debtor releases?

6.      Did the bankruptcy court err by approving the Debtors' disclosure statement and plan solicitation materials?

7.     Did the bankruptcy court err by authorizing the Debtors to advance funds to establish the creditor trusts and other entities required to implement the debtors' plan and take other related actions, prior to consummation of the plan?

## STANDARD OF REVIEW

This Court reviews "findings of fact for clear error and conclusions of law *de novo*." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 138 n.54 (2d Cir. 2017).

The Second Circuit has held that "'[a]n abuse of discretion occurs when a [trial] court bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or renders a decision that cannot be located within the range of permissible decisions.'" *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 234 (2d Cir. 2020) (quoting *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018)).

Where, under the reasoning of *Stern v. Marshall*, 564 U.S. 462 (2011), the Constitution does not permit a bankruptcy court to enter final judgment on a bankruptcy-related claim that is a "core proceeding" under 28 U.S.C. § 157(b)(2), then that claim must be treated as "non-core" and the bankruptcy court's related findings of fact and conclusions of law should be reviewed as "proposed findings and conclusions" subject to *de novo* review by the district court under 28 U.S.C. § 158(c). *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 36 (2014); *see also* Fed. R. Bankr. P. 8018.1.

## STATEMENT OF THE CASE

I.     **Statutory and legal framework**

A.     **Bankruptcy relief under chapter 11 is limited by the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code allows "a debtor to reorganize its business or financial affairs or to engage in an orderly liquidation of its property either as a going concern or otherwise." 7 Collier on Bankruptcy ¶ 1100.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); 11 U.S.C. §§ 1101 *et seq*. The "statutory goal of every chapter 11 case" is the confirmation

of a plan of reorganization, *see Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 465 n.4 (1999) (Stevens, J., dissenting), which occurs when a proposed plan has been ratified by creditors and approved by the court.  11 U.S.C. § 1129.

Holders of claims against or interests in the debtor that are affected by the plan may vote to accept or reject a proposed plan.  *See* 11 U.S.C. § 1126(a).  A plan will typically divide those holders of claims or interests into different voting classes based on the nature of the claim or interest, *see* 11 U.S.C. § 1122, and each class will separately vote to accept or reject the plan. *See* 11 U.S.C. § 1126(c), (d).  In determining whether a class has accepted a plan, the Code looks only to the percentage of votes that were cast to accept or reject the plan.  11 U.S.C. § 1126(c).

Although the acceptance or rejection of the plan by the classes will determine whether the plan has met certain of the statutory requirements for confirmation, *see* 11 U.S.C. § 1129(a)(8)(A), a vote in favor of the plan by the class is not dispositive of the rights of individual class members for other purposes.  In particular, the fact that a creditor's class has voted in favor of the plan does not prevent that creditor from objecting to the plan generally, *see* 11 U.S.C. § 1128(b), or from asserting certain other individual creditor rights protected by the Bankruptcy Code.  *See*, *e.g.*, 11 U.S.C. § 1129(a)(7)(A) (providing that plan that fails to satisfy statutory "liquidation test" as to a dissenting creditor may not be approved, regardless of whether plan was approved by creditor's class).

For a debtor to solicit acceptances of a proposed plan, it must provide a disclosure statement, along with a copy or summary of the proposed plan.  11 U.S.C. § 1125(b).  The disclosure statement must be approved by the court "as containing adequate information" to "enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a).

"The court shall confirm a plan only if it complies with all" of the requirements of section 1129(a), which include that "[t]he Plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a).  The plan proponent bears the burden to prove that it met the requirements for confirmation by a preponderance of the evidence.  *In re Charter*

6

*Commc'ns*, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (citing *Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993)).

Bankruptcy judges have an independent duty to inspect and disapprove improper plans. *See U.S. Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 (2010).

**B.    The bankruptcy discharge in non-asbestos chapter 11 cases does not extend to non-debtors.**

In general, confirmation of a reorganization plan discharges a chapter 11 debtor from liability for most debts that arose before confirmation of the debtor's plan.  11 U.S.C. § 1141(d). The relief provided by a bankruptcy discharge is broad, but it is neither unlimited nor unconditional.  Foremost, to receive the discharge, a person must file for bankruptcy.  Those who do must subject themselves to the supervision of the bankruptcy court, provide public disclosure of their finances, and comply with numerous other statutory duties as conditions for receiving bankruptcy relief.  *See* 11 U.S.C. § 521.  Failing to comply with these duties can lead to dismissal, conversion to a liquidation proceeding under chapter 7, or appointment of a private trustee who assumes management of the estate.  *See* 11 U.S.C. §§ 1104, 1108, 1112.

Not everyone is eligible for bankruptcy relief, *see* 11 U.S.C. §§ 109, 727, 1141(d), and not all debts are dischargeable, *see, e.g.*, 11 U.S.C. § 523(a)(2), (4), (6).  A chapter 11 discharge may be granted only after the debtor complies with a detailed set of statutory procedures and requirements, *see* 11 U.S.C. §§ 1129, 1141, and only as part of a public judicial process in which all creditors can participate.  *See* 11 U.S.C. §§ 341, 1109.

With one exception, the Bankruptcy Code discharges only the debtor's liabilities upon plan confirmation.  11 U.S.C. §§ 524(a), 1141(d)(1)(A).  The Bankruptcy Code specifies that "[a] discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).  The one exception applies exclusively to asbestos-related cases in which the bankruptcy court is authorized to enjoin certain types of claims against a specified set of non-debtors, and only after the court finds an extensive series of statutory requirements are met.  11 U.S.C. § 524(g).

7

### C.      The role of the United States Trustee

The United States Trustee is a Department of Justice official appointed by the Attorney General to supervise the administration of bankruptcy cases.  28 U.S.C. §§ 581-589.  United States trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena."  H.R. Rep. No. 595, 95th Cong., 2d Sess., at § 329, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049 (1978).  United States Trustees have standing under 11 U.S.C. § 307 to appear and be heard on any issue in any bankruptcy case, despite the lack of pecuniary interest in the outcome.  *Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156, 161 (2d Cir. 2010).  He is specifically authorized to comment on proposed disclosure statements and chapter 11 plans.  28 U.S.C. § 586(a)(3)(B).

## II.      Statement of the Facts

### A.      Purdue—but not the Sackler Family—files for chapter 11 bankruptcy relief to resolve their respective liabilities relating to the opioid epidemic.

Purdue Pharma L.P. and its related entities are pharmaceutical companies that manufacture, sell, or distribute, among other products, extended-release, long-acting opioid pain medications.  App.1237.  Purdue commenced a voluntary case under chapter 11 of the Bankruptcy Code on September 15, 2019.  Dkt. 1.  Purdue is wholly owned by a non-debtor, Pharmaceutical Research Associates LP ("PRA").  App.1252.  PRA is owned by two entities, each of which is ultimately owned by various trusts for the benefit of members of the Raymond Sackler family and Mortimer Sackler family (collectively, the "Sackler Family").  *Id*.  No member of the Sackler Family is a debtor in these cases.

From January 1, 2008, through September 30, 2019, Purdue made $10.347 billion in total net cash distributions to or for the benefit of the Sackler Family and related entities.  App.1544.  During that same time, Purdue may have transferred significant value in non-cash assets to the Sackler Family and related entities.  App.1546.  Purdue has confirmed that the Sackler Family's estimated current net worth is approximately $11 billion.  App.1563.

8

When Purdue filed for bankruptcy relief, its most prominent pain medication, OxyContin, was the target of over 2,600 civil actions pending in various state and federal courts and other fora across the country.  App.1237.  Those lawsuits generally allege that Purdue falsely and deceptively marketed OxyContin and opioid pain medications and is liable for the national opioid crisis.  *Id*.  Most, but not all, plaintiffs in those actions are governmental entities, including the attorneys general of 49 states, territories, and the District of Columbia, as well as thousands of county and municipal governments.  App.1274.

By the time Purdue filed for bankruptcy relief, various Sackler Family members and related entities were also defendants in approximately 400 civil actions nationwide.  App.1562.  Purdue and the Sackler Family determined that Purdue—but not the members of the Sackler Family—would file for bankruptcy relief to resolve their respective opioid liabilities.  App.2028-2029.

Early in the case, the bankruptcy court enjoined both thousands of lawsuits against Purdue and hundreds of lawsuits against the Sackler Family.  App.576, n.5; App.1562.  The bankruptcy court acknowledged that absent this injunction "presumably most of the other actions would be amended to add Sackler Family members as defendants, and other third parties also would attempt to pursue such claims, as well."  App.576, n.5.  This Court affirmed the bankruptcy court's injunction order.  *See Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm.)*, 619 B.R. 38, 42 (S.D.N.Y. 2020).[2]

During Purdue's bankruptcy case, the Sackler Family entered into a settlement agreement with the United States resolving certain civil claims against individual Sackler Family members for misconduct related to OxyContin.  App.1321-1325.  Although the Sackler Family denied all allegations of wrongdoing, the settlement agreement included a set of factual allegations by the federal government that detailed the personal misconduct of certain individual family members.  App.1343-1373.  Separately, Purdue entered into a criminal plea agreement and civil settlement

---

[2] The United States Trustee was not a party to that appeal.

agreement with the United States to resolve its criminal and civil liability to the federal government.  Dkt. 1828.

        **B.**     **The confirmation proceedings.**

            **1.**     **The bankruptcy court sets a deadline for Purdue's creditors to file claims against Purdue—but not the Sackler Family or other non-debtors.**

The bankruptcy court set a July 30, 2020, deadline for everyone holding a pre-petition claim against Purdue to file proofs of claim against Purdue.  App.1298-1301.  Neither that order nor any subsequent order set a deadline or procedure for anyone to file proofs of claim based upon claims held against the Sackler Family or other parties that had not filed for bankruptcy relief.  App.2163-2164.  *See* Fed. R. Bankr. P. 3003(c)(3).

            **2.**     **Purdue's disclosure statement provides insufficient information about the Non-Debtor releases.**

In March 2021, Purdue filed a proposed disclosure statement for its proposed chapter 11 plan of reorganization.  Dkt. 2488.  A disclosure statement should provide sufficient information to permit a reasonable investor or creditor to reach an informed decision about whether to vote in favor of the proposed plan.  11 U.S.C. §§ 1125(a) & (b).  The United States Trustee objected to the disclosure statement, arguing that the bankruptcy court should not approve it because, among other things, it did not contain adequate information regarding the releases and injunctions contemplated for the Sackler Family and other non-debtors, and questioned the court's authority and jurisdiction to issue the releases.  Dkt. 2686.

Purdue later amended its disclosure statement but did not rectify the problems identified by the United States Trustee.  App.1392-1890.  On June 3, 2021, the bankruptcy court entered the Disclosure Order approving Purdue's disclosure statement and solicitation materials. App.647-945.  Purdue sent the disclosure statement and proposed fifth amended plan directly to those who requested to receive service in the case and those entitled to vote on the plan. App.667.

Purdue also sent notice of the confirmation hearing and a notice of non-voting status to those who filed proofs of claim but were not entitled to vote because they were statutorily deemed to have accepted or rejected the fifth amended plan.  App.652; App.656-657; *see* 11 U.S.C. § 1126(f) & (g).  That notice attached an exhibit with the language of the proposed plan's provision to release "Shareholder Released Parties," but did not include a list of all the parties who would be released.  App.656; App.762-866.

> **3.     Publication notice of the confirmation hearing also provides insufficient information about the termination of non-debtors' rights against the Sackler Family and other non-debtors.**

Purdue also provided publication notice of the confirmation hearing by a variety of means.  App.654.  The publication notices generally provided information about the confirmation hearing and the deadlines for Purdue's creditors to vote on and object to the Plan and they stated that the Plan includes releases of "Shareholder Released Parties," including "members of the Sackler families and certain other individuals and related entities."  App.893; App.935; App.943.

The notices Purdue published did not explain that "certain other[s]" included within the releases meant hundreds of individuals and entities.  Nor did they state that the Plan would pay nothing for the claims that creditors of Purdue held against the Sackler Family and the multitude of other non-debtors that would be immunized from civil liability in future opioid-related litigation.  App.892-915; App.935-945.

The bankruptcy court did not approve publication notice of Purdue's confirmation hearing until June 3, 2021—ten months after the July 30, 2020, deadline to file a claim against Purdue had passed and 41 days after the deadline set by Purdue to file a claim for personal injury.  App.654; App.1298-1301; App.334, n.6; App.393, n.5.

> **4.     Purdue's proposed plan would release hundreds of non-debtor parties under its settlement with the Sackler Family allowing payment over nine to ten years and requiring a new claims process for victims to get paid.**

11

Under Purdue's proposed chapter 11 plan,[3] its business would be transferred to a newly created company (NewCo) that will be indirectly owned by certain trusts.  App.1402.  Purdue's existing shareholders (who are ultimately owned or controlled by Sackler Family members) would pay in the aggregate $4.275 billion to various trusts to be established under the Plan. App.1402; App.1404-1405.  The payments from the Sackler Family would be made over no fewer than nine or ten years under the auspices of an agreement settling claims between them. App.953; App.980.

While the Plan documents provide some information as to a division of responsibility between the different sides of the Sackler Family, it is not fully clear which members of the Sackler Family will be making which payments or from what sources.  App.3236; App.3244. And some of those listed as "Shareholder Released Parties" under the Plan will make no financial contribution.  App.3227; App.3235.

A portion of the contributions would be distributed through one trust (the "PI Trust") to two separate groups of personal injury claimants for their claims against Purdue (but not for their causes of action against the Sackler Family): (1) those with claims arising from exposure to opioids in utero ("NAS PI"), and (2) those with claims arising from their own opioid use or from the death of someone who had used opioids ("non-NAS PI").  App.1405.  Of the approximately $5 billion committed to fund the various trusts under the proposed plan, no more than $700 to $750 million would be directed to the PI Trust, and even that will be diminished by deductions and holdbacks as directed under the Plan.  App.1402-1403.

Qualified claimants in the first group would be entitled to gross awards of approximately $7,000 before deductions and holdbacks, which may be paid out in installments.  App.1406. Qualified claimants in the second group would be entitled to awards between $3,500 and $48,000 before deductions and holdbacks; any award greater than $3,500 may be paid in

---

[3] As discussed in the following section, Purdue filed numerous amendments to its proposed plans, all of which contained the Non-Debtor release in some form, and none of which resolved the United States Trustee's statutory and constitutional concerns.

12

installments.  App.1406.  The proposed plan also directs only $5 million to a separate trust (the "PI Futures Trust") for those with opioid-related causes of action arising post-petition.  App.1406.  The Debtors did not seek appointment of a future claimants representative for such claims.

Both the PI Trust and PI Futures Trust would be governed by their own separate trust distribution procedures.  The PI Trust would require a separate claim process on top of the bankruptcy case's claim process.  App.1407-1408; App.1410; *see also* Dkt. 3404 (objecting to plan confirmation because the additional trust claim process "will emotionally, physically, psychological[ly] burden each individual Creditor by incurring, yet again, excessive time, energy and expense completing and submitting additional claim forms and evidence previous submitted.").  And to seek a distribution from the PI Futures Trust, a claimant—thus far unrepresented by a future claimants representative—would have to file a formal lawsuit against it in this Court.  App.433.

Section 10.7(b) of the proposed plan included the Non-Debtor releases, a broad release of causes of action against all "Shareholder Released Parties," including the "Sackler Family Members"—which was defined to include Raymond and Mortimer Sackler, any of their descendants, any current and former spouses, and any of their estates—as well as six other broad categories that encompass potentially thousands of individuals and entities.  Dkt. 2982 at 40, 41-42, 132-34; App.1110-1112; App. 1201-1202.  Under its terms, it is impossible to identify all those being released, but they include Sackler Family members still unborn.

In various declarations, David Sackler and certain representatives of trusts for the benefit of the Mortimer Sackler side of the family represented that they would not contribute any assets to Purdue's plan absent the Non-Debtor releases.  App.2011-2012; App.2043-2086; App.2087-2094.  At least one declarant threatened that, if any exception to the release were made for any objector to the Plan, the Sackler Family would instead "mount a vigorous legal defense," using the assets in these trusts so as to ensure that their Sackler Family beneficiaries would not be subject to "statutory or common law claims relating to Purdue."  App.2044.

    5.    **The United States Trustee objects to the proposed plan on constitutional and statutory grounds; others also object; 2,683 victims who filed opioid-related personal injury claims against Purdue vote to reject the plan; and over 70,000 (51%) victims do not vote.**

The United States Trustee advanced various arguments in his objection to the effective discharge of the non-debtors' opioid-liability, including that (1) it was not permitted by the Bankruptcy Code, (2) if approved, it would violate the non-debtor releasing parties' constitutional rights, (3) the bankruptcy court lacked constitutional authority to approve it, and (4) it was impermissible under Second Circuit precedent.  Dkt. 3256 at 16-19, 21-26, 29.

The United States Attorney for the Southern District of New York filed a Statement echoing the due process and other concerns expressed by the United States Trustee.  Dkt. 3268. Victims, including those who lost loved ones to opioid addiction, similarly objected to the proposed extinguishment of their claims.  *See, e.g.*, App.2095-2098; App. 2099-2100; App.2101-2107; App.2108-2109; App.2110-2115; App.2116-2121; App.2122-2123; App.2124-2127; App.2128-2132; App.2374; *see also* App.2133-2161.  And other parties such as state and local governments, insurers, and industry participants, also objected, some of whom expressed similar concerns.  Dkt. 3264, 3270, 3272, 3274, 3275, 3276, 3278, 3279, 3280, 3292, and 3306.  Victims also objected to the Plan because they felt that the Plan did not adequately compensate their personal injury claims.  *See, e.g.,* Dkt. Nos. 2966, 3125, 3028 3404, 3575.

Overall, of the 618,194 claims filed in Purdue's case that were entitled to vote, only 120,301 creditors (or less than 20%) voted to accept or reject the Plan, with the remainder not voting at all.  App.1895; App.1900.  And looking specifically at the collective 137,041 creditors who filed opioid-related personal injury claims, 62,433 claimants voted to accept the Plan, 2,683 claimants affirmatively voted to reject the Plan, and over 70,000 (51% of the personal injury claimants) did not vote at all.  App.1895; App.1900.

**6.   Purdue repeatedly amends its proposed plan but keeps the Non-Debtor releases to which the United States Trustee maintains his constitutional and statutory objections.**

Between the morning that the confirmation hearing began and the day after the bankruptcy court rendered its oral ruling stating it would confirm the plan—a span of 21 days—the Debtors amended their proposed plan six times.  *See* Dkt. 3545, 3632, 3652, 3682, 3706, 3726.  Each amendment altered the release language in small ways, but continued to release an unknown, and unidentifiable, number of non-debtors from liability without the informed consent of the releasing parties.  *See*, *e.g.*, Dkt. 3682 at 43 (definition of "Shareholder Released Parties"); *id*. at 132-33 (Plan § 10.7(b)).

The United States Trustee filed supplemental objections to the amended plans reasserting his prior statutory and constitutional objections, and further objecting to amendments filed after the close of evidence.  Dkt. 3636, 3710.

**7.   The bankruptcy court provisionally confirms Purdue's plan.**

The bankruptcy court held a confirmation hearing that culminated in a September 1, 2021, oral ruling provisionally approving Purdue's then-eleventh amended plan subject to modifications of two provisions.  App.2328-2329; App.2348-2349.  The first modification required that the text of the Non-Debtor releases be changed to reflect that they would terminate claims against the Shareholder Released Parties where Purdue's conduct was a "legal cause or legally relevant factor" to the cause of action.  App.2328-2329.  The second modification required a change in the language to the Plan provision regarding the future gate-keeping role of the bankruptcy court to determine whether a future claim brought by a plaintiff was terminated by the Non-Debtor releases or may proceed in a different court.  App.2348-2349.

The following day, Purdue filed the Plan, which incorporated the bankruptcy court's requested edits.  App.1070-1227.

a.   **The Plan extinguishes a vast array of non-debtors' claims against the Sackler Family and other non-debtors, including claims that could not be discharged by an individual filing for bankruptcy.**

Section 10.7(b) of the Plan, which is over a page long and cross references several other definitions, contains the release that extinguishes non-debtors' claims against the Sackler Family and related entities.  App.1100; App.1201-1202.  It provides, in relevant part, that "the Shareholder Released Parties . . . shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released . . . by the Releasing Parties from any and all Causes of Action" that are "based on or relating to, or in any manner arising from, in whole or in part, . . . the Debtors" and "as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor."  App.1201.

The Plan does not define what it means for a debtor's conduct, omission, or liability to be an "otherwise legally relevant factor" to a "Cause of Action" when such conduct, omission, or liability is not the "legal cause" of the "Cause of Action."

The Plan includes an expansive, 24-line long definition of "Cause of Action" as not only "any Claim"—separately defined as having "the meaning set forth in section 101(5) of the Bankruptcy Code," App.1079—but also any

> action, class action, claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, rights of subrogation, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, loss, cost, attorneys' fees and expenses, account, defense, remedy, offset, power, privilege, license or franchise, in each case, of any kind, character or nature whatsoever . . . whether arising before, on or after the Petition Date

under any theory of law, including "fraud," "negligence," "gross negligence," "recklessness," "public or private nuisance," "breach of fiduciary duty," and "willful misconduct."  App.1079.  The definition expressly includes any "Cause of Action" held by those "not yet born."  *Id.*

Thus, the Plan releases far more than bankruptcy "Claims," which the Bankruptcy Code defines as a "right to payment" or equitable remedies "for breach of performance if such breach

16

gives rise to a right to payment."  11 U.S.C. § 101(5).  The released "Causes of Action," by

contrast, extend to claims "of any kind, character or nature whatsoever."  App.1079.  Notably,

the Non-Debtor releases include claims that individual debtors could not have discharged in

bankruptcy, such as for fraud, breach of fiduciary duty, and willful and malicious injury.  *See* 11

U.S.C. §§ 523(a)(2), (4), (6).

> **b.  The Plan shields the Sackler Family and hundreds of others, named and unnamed, from opioid claims held by everyone with (1) a pre-petition claim against Purdue or (2) a post-petition opioid "Cause of Action" "related to" Purdue.**

The Plan's definition of "Releasing Parties"—those non-debtors stripped of their causes

of action against the Sackler Family and other non-debtors—is also opaque.  Like section

10.7(b), it, too, cross-references several other definitions, which in turn cross reference more

definitions.  App.1109 (definition of "Releasing Parties," which includes the defined terms

"Holders," "Interests," "Debtors," "Future PI Channeled Claims," and others).

The Plan defines the "Releasing Parties" as including, among others, both (1) "all

Holders of Claims . . . against" Purdue, even if the Claims are not "treated under" the Plan, and

(2) "all Holders of Future PI Channeled Claims."  *Id.*

The first of these groups includes anyone who holds a pre-petition bankruptcy claim

against Purdue, whether or not related to opioids.  App.1079 (definition of "Claim").

The second group includes anyone with an opioid-related claim *relating to* Purdue if that

claim arose after it filed for bankruptcy and relates to a NewCo opioid product.  The Plan defines

a "Future PI Channeled Claim" to include "any alleged opioid-related personal injury or similar

opioid-related Cause of Action against any Released Party or Shareholder Released Party,"

"based on or *relating to*, or in any manner arising from, in whole or in part, the Debtors," other

than certain claims that arose before Purdue filed for bankruptcy, "in each case, that arises from

or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by

NewCo or any successor owner of NewCo's opioid business."  App.1086-1087 (emphasis

added); *see also* App.1096 (definition of "NAS PI Channeled Claim,"); App.1100 (definition of "Non-NAS PI Channeled Claim"); App.1102 (definition of "PI Channeled Claim").  An extinguished "Future PI Channeled Claim" thus includes post-petition opioid-related "Causes of Action" "relating to" Purdue, whether or not the "Holder" of the cause of action also had a claim against Purdue.

Thus, regardless of whether they actually filed a claim against Purdue, or even knew that they had one, the Plan strips everyone who has either (1) a bankruptcy claim of any sort against Purdue that arose before it filed for bankruptcy, or (2) an opioid-related claim relating to Purdue that arose after it filed for bankruptcy and that relates to an opioid manufactured by or placed in the stream of commerce by NewCo, of their separate opioid-related claims against the Sackler Family and hundreds of other non-debtors.  The releases thus extend even to someone *with no claim against Purdue* but who has a Purdue-*related* opioid claim against the Sackler Family that arose after bankruptcy.

> **c.      The Plan shields the Sackler Family and hundreds of others, named and unnamed, from opioid-related claims against them.**

The Plan's definition of the "Shareholder Released Parties" is similarly inscrutable.

The Plan lists seven categories of releasees, releasing potentially thousands of individuals, entities, and assets.  App.1112.  As with section 10.7(b) and the definition of "Releasing Parties," the definition of "Shareholder Released Parties" cross-references other definitions.  *Id.*  Among these are the "Sackler Family Members," *id.*, defined to include Raymond and Mortimer Sackler, any of their descendants (including those as-yet unborn), any current and former spouses, and any of their estates, App.1110.

But looking at the Plan alone is not enough to determine who is included in the definition of the "Shareholder Released Parties" because it also includes "the Persons identified on Exhibit X" to the Shareholder Settlement Agreement approved with the Plan.  App.1112; App.1041-1069.  Exhibit X has over a thousand line-entries, some of which list categories without names

18

such as certain persons' "spouses, children and grandchildren" and such vague terms as "assets, businesses and entities."  App.1042; App.1045; App.1046; App. 1050.

The Non-Debtor releases even release "property possessed or owned at any time" by the non-debtors immunized by the Plan.  App.1112.

> ### d.    The Plan pays nothing to opioid victims in return for extinguishing their claims against the Sackler Family and hundreds of other non-debtors.

The Plan provides compensation for opioid-related personal injuries only to creditors of Purdue who timely filed proofs of claim against Purdue and who then file an additional claim against the personal injury trusts within a certain period or, for future claimants, who then file suit in federal court.  App.1126-1127; App.1157; App.332; App.334; App.391; App.393; App.432.  The compensation provided, even to those with catastrophic injuries, is as little as $3,500, and no more than $48,000 paid in installments for as many as ten years.  *See* App.1406; App360.  But the actual compensation will be less because of deductions related to, among other things, fees and expenses as directed under the Plan.  *See* App.1406; App.1103 (definition of "PI Trust Deductions and Holdbacks").

Purdue's Plan denies the victims of the opioid crisis any compensation for their separate direct claims against the Sackler Family (and hundreds of other non-debtors).  The Plan documents expressly prohibit any value being paid based on pre-petition causes of action against the Sackler Family or other non-debtors for opioid-related personal injury claims.  App.333 ("Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, *and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added); App.392 ("Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, *and not to any associated NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added).

The same is true for every opioid-related cause of action arising post-petition.  App.433 ("A Future PI Claimant *may not pursue* litigation against the PI Futures Trust for any Future PI

Channeled Claim *formerly held or that would have been held against a non-Debtor party*.") (emphasis added).

The trust documents for the PI Trust allow only those who filed proofs of claim against Purdue prior to April 23, 2021, to proceed against the trust.  App.334 n.6; App. 393, n.5.  But, as noted in section B.3 *supra*, notice of the Plan and its extinguishment of creditors' claims against the non-debtor Sackler Family and others came after June 3, 2021—over a month after the April 23 deadline.  App.654; App.892-915; App.933-945.  The trust documents provide only two exceptions to the April 23 deadline, if the trust's claims administrator determines that "good cause exists to treat the late-filed [claim] as if it were timely filed," or by order of the bankruptcy court.  App.334, n.6; App.393, n.5.  Neither the Plan nor the trust documents provide a standard by which the bankruptcy court may so order.[4]

Similarly, the trust documents for the PI Futures Trust generally require those with an opioid-related cause of action arising post-petition to have filed a proof of claim by the July 2020 bar date—long before the notice of the Plan was issued—or to file a motion for a late claim prior to the date of confirmation.  App.432; App.1298-1301.  The trust documents would permit a future claimant who did not meet these deadlines to proceed against the PI Futures Trust only if the bankruptcy court in its discretion determined the claim qualified under the Plan and granted leave for the claimant to assert his or her claim.  *Id*.

Thus, under the procedures established for either the pre- or post-petition personal injury trusts, late-filing claimants who wanted to file a claim against one of the trusts after receiving notice of the Plan would have to proceed through multiple stages before determining whether they can even begin the process of proceeding against the trusts.

---

[4] *See*, *e.g.*, Dkt. 3957 (order denying motion for leave to file proof of claim after bar date for failure to show sufficient cause).

C.      **The bankruptcy court enters the Confirmation Order and a modified bench ruling.**

On September 17, 2021, the bankruptcy court entered its Confirmation Order, App.1-487, and modified its September 1, 2021 bench ruling to "make it clearer, add information that [the court] inadvertently omitted, and . . . correct typographical errors in the transcript [of the bench ruling]." App.488, n.1.

The court held that "bankruptcy subject matter jurisdiction to impose a third-party claims release and injunction under the plan exists" where a release directly affects the res of the Debtors' estates, including where there are "insurance rights, the shareholder released parties' rights to indemnification and contribution, and the Debtors' ability to pursue the estates' own closely related, indeed fundamentally overlapping, claims." App.598.

The court overruled due process objections to the extinguishment of the non-debtors' claims against the Sackler Family and the other non-debtors on the ground that a third-party release is not "an adjudication of the claim . . . [but] part of the settlement of the claim that channels the settlement funds to the estate." App.600. As to notice, the court also ruled that "only holders of claims against the Debtors are being deemed to grant the shareholder release, and it is equally clear that holders of such claims received due process notice of the plan's intention to provide a broad release of third-party claims against the shareholders and their related entities related to the Debtors." App.600.

The court also held that a "proceeding to determine whether a Chapter 11 plan that contains such a release should be confirmed not only is a core proceeding under 28 U.S.C. § 157(b), but also is a fundamentally central aspect of a Chapter 11 case's adjustment of the debtor/creditor relationship and, therefore, 'constitutionally core' under *Stern v. Marshall*, 564 U.S. 462 (2011), and its progeny." App.603 (citations omitted).

As to the statutory objections, the court held that "[i]t appears clear, therefore, under well-reasoned caselaw as well as the Code itself that section 524(e) is not a statutory impediment to the issuance or enforcement of a third-party claim release under a plan in appropriate

21

circumstances."  App.611.  As to the authority supporting such releases, the court held that "there is a sufficient source of power in the Bankruptcy Code itself, in sections 105(a) and 1123(a)(5) and (b)(6), as well as in the Court's inherent equitable power."  App.618.

Finally, the court held that the Non-Debtor releases satisfied Second Circuit precedent. App.612-619.  The Court cited *In re Quigley Co.*, 676 F.3d 45 (2d Cir. 2012), and held that "[t]o properly be subject to a third-party claims release under a plan, therefore, the third-party claim should be premised as a legal matter on a meaningful overlap with the debtor's conduct." App.617.

### D.   The bankruptcy court issues the Advance Order prior to the Confirmation Order.

Four days before the bankruptcy court entered its Confirmation Order, the bankruptcy court held a hearing on Purdue's motion seeking approval of the advance funding of various trusts before the effective date of the plan ("Advance Motion").[5]  App.2361; App.1956-2010. Two days later, the court granted the Advance Motion and issued the Advance Order, App.1228-1233, over objections of the United States Trustee and four of the non-consenting states, Dkt. Nos. 3493; 3555.

The Advance Order authorized Purdue to begin implementing the Plan before its effective date and before confirmation, including by advancing millions of dollars to eight trusts. App.1228-1233.  Purdue represented that the funds would be spent to retain professionals, build relevant technology, provide accounting and legal services, and compensate the managers and the trustees of the various Plan trusts.  App.1956-2010.

---

[5] The Plan set forth various conditions precedent before its effective date could take place. App.1084; App.1192-1193.  But it provides that on that effective date, the "Plan shall be deemed substantially consummated . . . consistent with the definition of 'substantial consummation' in section 1101(2) of the Bankruptcy Code."  App.99.

### E.      The United States Trustee appeals and seeks a stay, as do others.

The same day that the bankruptcy court issued the Advance Order, and two days before the bankruptcy court entered its final order confirming the Plan, the United States Trustee appealed the bankruptcy court's oral ruling confirming the Plan and the Advance Order. App.3197-3215.  The United States Trustee filed an amended notice of appeal after the bankruptcy court entered the Confirmation Order.  App.3216-3220.

Others also filed notices of appeal, including eight states, the District of Columbia, certain Canadian municipalities and First Nation groups, and several individuals.  Dkt. 3724 (amended by Dkt. 3812), 3725, 3774, 3775, 3780 (amended by Dkt. 3839), 3784 (amended by Dkt. 3818), 3810, 3813, 3832, 3849, 3851, 3853, 3877 & 3878.

The United States Trustee also sought a stay before the bankruptcy court.  Dkt. 3778 (amended by Dkt. 3801).  The states of Washington, Connecticut, and Maryland, among others, also sought a stay of the Confirmation Order pending their appeals, Dkt. 3789 & 3845.

### SUMMARY OF THE ARGUMENT

As grounds for its decision to confirm the Plan resolving and paying claims asserted by Purdue's creditors against Purdue and also immunizing the Sackler Family and hundreds of other non-debtors from opioid-related suits, the bankruptcy court cited the massive public health crisis posed by the opioid epidemic and the efforts of various parties to negotiate a global solution. App.488; App.450.  The government questions neither the urgency of the opioid crisis nor the parties' motives to find a solution.  But the bankruptcy court's decision must nevertheless be reversed.

On several independent and alternative grounds, the Plan is unconstitutional.  It violates the due process rights of victims by foisting on them a "settlement" that terminated their litigation rights against non-debtors without their consent.  It did so notwithstanding the thousands who voted against the Plan and the tens of thousands who did not vote at all.  It did so without reasonable notice to thousands of victims that their claims against hundreds of as-yet-

23

unspecified non-debtors would receive no compensation unless they filed claims against the Purdue estate by a deadline that arose before Purdue filed its disclosure statement publicly disclosing that these claims against third parties would be extinguished.  And it did so without providing any compensation in exchange for the terminated claims.

Additionally, the Bankruptcy Clause solely authorized Congress to issue laws on the subject of bankruptcies.  Adjustment of obligations between non-debtors, for the purpose of achieving ends unrelated to the debtor's relationship with its creditors, falls far outside the scope of the Bankruptcy Clause.

And, in finally terminating state law claims that it had no constitutional authority to adjudicate under *Stern*, the court acted outside its authority as an Article I court.  This constitutional error is compounded in establishing the bankruptcy court as a permanent gatekeeper to future lawsuits which, again, it lacks authority to adjudicate.

The Plan also violated the Bankruptcy Code.  There is no statutory authority to extinguish the direct claims against the Sackler Family and related non-debtors.  Only one provision allows a limited release of non-debtor claims against other non-debtors and only in asbestos-related cases under specific conditions that are not satisfied here.  It is not satisfied because this is not an asbestos-related case and, even if it were, the protections required by the statute would not be satisfied.

Further, the Plan granted the individual non-debtors greater relief than they could receive if they had filed for bankruptcy themselves and did so without the concomitant obligations imposed on debtors.  They neither provided the financial disclosures, nor devoted all of their assets to the estate as would have been required in their own bankruptcies.  And certain of their liabilities—such as for fraud, breach of fiduciary duty, and willful and malicious injury—were extinguished that could not have been discharged under the Bankruptcy Code.

Second Circuit precedent does not authorize this perversion of the bankruptcy laws.  The Plan dramatically oversteps the bounds of the Bankruptcy Code by terminating non-debtors' claims against the Sackler Family and other non-debtors for their independent misconduct,

separate and apart from the misconduct of Purdue. At no point has the Second Circuit held that a bankruptcy court could, against a constitutional challenge, permanently extinguish non-debtors' direct causes of action against other non-debtors, in the absence of express statutory authority and without compensation, adequate notice, or consent. The Confirmation Order and related orders must be reversed.

## ARGUMENT

**I.    The Plan's extinguishment of non-debtors' claims against other non-debtors is unconstitutional.**

**A.    The Plan's extinguishment of non-debtors' direct claims against other non-debtors violates the Due Process Clause.**

The Due Process Clause provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It was violated here because the Plan extinguished non-debtors' litigation rights against other non-debtors without consent, adequate notice, or compensation.

**1.    Litigation rights are property rights within the Due Process Clause.**

"[L]egal claims are sufficient to constitute property such that a deprivation would trigger due process scrutiny." *Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 158 (2d Cir. 2016) (citing *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169–70 (2d Cir. 2001)). "Statutory or common law entitlement to be fully compensated through a lawsuit for one's injuries should be considered a species of property" protected by the Due Process Clause. *Barrett v. United States*, 689 F.2d 324, 332 (2d Cir. 1982). *See also Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 94 (1978) (recognizing the deprivation of a "state-created right to recover full compensation for tort injuries" is a cognizable property right subject to due process analysis) (Stewart, J., concurring).

The Confirmation Order ensures that the merits of the released opioid-related causes of action against the Sackler Family and other non-debtors will never be heard or determined. The bankruptcy court explained to one of the many victims who lost a loved one to opioids that "[t]he

merits [of the claims against Purdue] . . . have not yet been determined" and would not be until after the Plan is confirmed.  App.2173-2174.  But, as for claims against the Sackler Family and other non-debtors, the Plan simply terminates them.

> ## 2.    The Plan deprives opioid victims of their claims without their consent.

The "deep-rooted historical tradition that everyone should have his own day in court" is a fundamental right guaranteed by the Due Process Clause.  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (quoting *Martin v. Wilks*, 490 U.S. 755, 762 (1989)).  Yet, here, opioid victims are forever deprived of their day in court against the Sackler Family and other non-debtors; they lost their claims without any opportunity to choose whether to litigate or to settle their claims, violating their due process rights.  *Motors Liquidation Co.*, 829 F.3d at 158.

That some of the opioid creditors voted in favor of the Plan does not mitigate the due process violation.[6]  Voting on a chapter 11 plan is the statutory system Congress designed for creditors to assess how the plan treats their claims against and interests in *a debtor*.  11 U.S.C. § 1126; *Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 799 (1996) (recognizing bankruptcy as "a special remedial scheme . . . [in which] legal proceedings may terminate pre-existing rights if the scheme is otherwise consistent with due process").  The bankruptcy system is not designed to require that creditors vote through a debtor's plan to wipe away debts owed by non-debtors.

Rather, as the bankruptcy court acknowledged, it approved the extinguishment of the claims against the Sackler Family and other non-debtors by way of a "settlement."  App.600.  But a plan may not constitutionally compel victims to forfeit their property rights against non-debtors without consent.  *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of*

---

[6] Fewer than 20% of those who filed a proof of claim in these cases voted for the Plan. App.1895; App.1900.  And at no point were victims ever asked whether they consented to give up their rights to sue the Sackler Family and others.  Creditors must vote on a plan as whole. That victims want and may desperately need their $3,500 for the claims against Purdue does not mean they would have knowingly given up their claims against the Sacklers and other non-debtors if given the choice.  Thus, even the votes for the Plan do not constitute express and affirmative consent to the Non-Debtor releases.

*Cleveland*, 478 U.S. 501, 529 (1986) ("parties who choose to resolve litigation through settlement may not dispose of the claims of a third party"); *United States v. Ward Baking Co.*, 376 U.S. 327 (1964) (court cannot enter consent decree to which one party has not consented). The law "does not sanction efforts by trial judges to effect settlements through coercion." *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985). The Confirmation Order coerces just such a so-called "settlement."

Nor could this settlement be coerced under an analogous rules-based framework of a class action. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597-98 (1997). At least twice, the Supreme Court rebuffed attempts by courts to address a national asbestos litigation crisis in ways that would bind class action plaintiffs without permitting them a chance to decline the settlement. *Ortiz*, 527 U.S. at 845-48; *Amchem Prods.*, 521 U.S. at 597-98. The Supreme Court has held that in adjudicating claims for monetary damages, "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class . . . ." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

And *Ortiz* expressly disapproved of the notion of a "limited fund" set by the agreement of the parties. 527 U.S. at 848-53. To certify a mandatory settlement class based on a limited fund theory, parties "must show that the fund is limited by more than the agreement of the parties . . . ." *Id.* at 864. The Sackler Family's assertion as to what funding it would be willing to provide would not qualify under this standard.

The Supreme Court thus cautioned against "adventurous application" of class action procedures that would "sound a warning of the serious constitutional concerns" posed by attempting to certify a "mandatory" settlement class of individual tort claimants. *Ortiz*, 527 U.S. at 845. Rather, the Supreme Court admonished that the class action procedure "cannot carry the large load" that the tort-feasors, class counsel, and trial court "heaped upon it." *Amchem*, 521

U.S. at 628-29.  The asbestos crisis at issue there was for Congress to address.[7]  *Id.*; *see also*

*Ortiz*, 527 U.S. at 821.

What is true about class actions is equally true about bankruptcies.  The bankruptcy court

failed to identify why the ordinary rules of due process did not apply here.

### 3. The Plan deprives opioid victims of their claims without adequate notice.

The Non-Debtor releases also violate the opioid victims' constitutional right to adequate

notice of the release in Purdue's bankruptcy case of their claims against the Sackler Family and

others.  *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  Regardless of

how widely notice of the Plan was published, actual notice of the Non-Debtor releases was

illusory.  The provisions defining who was deemed to release claims, what claims were released,

and who may or may not be sued under the Plan defies comprehension.  And such notice came

too late to allow victims to then file claims in Purdue's case.

As explained in the Statement of the Facts, sections B.3 and B.6(b) & (c), *supra*, neither

the notice of the Plan nor the Plan itself provide creditors with adequate information regarding

the extinguishment of their right to sue the Sackler Family and other non-debtors due to Purdue's

bankruptcy case.  Even if a creditor were to review the Plan, both the sheer breadth of the

definition of "Shareholder Released Parties," and its inclusion of unnamed individuals and

entities, make it impossible to know who one may sue after Plan confirmation.  App.1112;

App.1041-1069.  Similarly, the scope of what claims are terminated—those to which Purdue's

conduct is "legally relevant," App.1201—remains a mystery.

And a victim would likely be unable to navigate the 52-lines of section 10.7(b) itself,

much less the thicket of cross-references of defined terms, as readily conceded by the bankruptcy

---

[7]  Unlike courts, it is within the constitutional powers of Congress to issue legislation to "structure and accommodate the burdens and benefits of economic life."  *Duke Power Co.*, 438 U.S. at 83-84 (holding that liability cap for nuclear disasters set by Congress did not violate due process unless it was "demonstrably arbitrary or irrational"); *see also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).

court and multiple witnesses testifying in support of the Plan.  App.494; App. 2165-2167; App.2186; App.2188-2189; App.2192.  The bankruptcy court acknowledged as "true" the United States Trustee's objection that the release provisions were "lengthy and complex" and that one needed "legal training to parse those provisions."  App494.  Dr. Richard Sackler testified that although he tried to read the Non-Debtor releases, they were so "extremely dense" and would take such "an enormous amount of time to fully understand" that he gave up.  App.2186.  And neither Purdue's Chief Financial Officer nor Mortimer Sackler himself could identify who was released under the provisions.  App.2165-2167; App.2188-2189; App.2192.  As the Chief Financial Officer testified, if he could not identify who is being released, the average opioid victim would not be able to do so, either.  App.2165.  And, although Dr. Sackler and Purdue's CFO were testifying about a prior version of the plan, the Non-Debtor releases in the current version are no more understandable.

Nor was the self-described "plain-language notice" adequate.  App.942-945.  The bankruptcy court claimed that this notice was "simple" because it stated that "the plan contemplated a broad release of the Sackler Family and their related entities."  App.494.  Yet, that notice failed to reveal the vast extent of the other non-debtors granted civil immunity by the Plan.  It mentioned only the Sackler Family "and certain other individuals and related entities," App.942-945, without disclosing that these parties included layers of trusts, unborn descendants, lawyers, and an unidentified array of others, App.942-945; App.1112; App.1041-1069.  And the notice did not disclose that the Plan would make no payment based on the extinguished claims.

Moreover, the notice that the Plan would extinguish non-debtors' causes of action against the Sackler Family and that they would only receive compensation on account of their claims against Purdue, *see* section 4 *infra*, came too late for those who had not filed proofs of claim against Purdue.  Not surprisingly, the notice of the deadline to file a proof of claim against Purdue said nothing about filing a proof of claim against the Sackler Family or other non-debtors.  App.2163-2164.  At least one objection to the Plan was filed by a victim who sued the Sackler Family but had not filed a claim against Purdue.  App.2128.  He was unaware that the

bankruptcy court had enjoined any actions against the Sackler Family until after the Plan was confirmed. *Id.* Indeed, his objection came after the Confirmation Order was entered. *Id.* Such inadequate notice violated his and other releasing parties' due process rights.

To the extent that the bankruptcy court relied on *Motors Liquidation Co.* to justify the notice provided in Purdue's case, App.601-603, such reliance was misplaced. That case involved a sale of the debtor's assets under 11 U.S.C. § 363 and established what notice was required to release claims against the debtor's estate. 829 F.3d at 155-58. It did not address what due process notice was required to terminate claims as to the debtor's successor for its own, post-closing, wrongful misconduct. *Id.*

### 4. The Plan deprives opioid victims of their claims without compensation.

Purdue, as the Plan proponent, substituted its judgment for the victims' own judgment about whether it was best to pursue their Sackler claims or accept the limited recovery based solely upon their Purdue claims. App.641-642. As made clear by the trust documents governing compensation under the Plan, compensation will be paid based on only claims against Purdue, and not those against the non-debtors like the Sackler Family. App.333; App.392; App.433.

Indeed, Purdue never even determined the value of the direct claims against the Sackler Family and other non-debtors that victims, states, and the other releasing parties are losing under the Plan's non-consensual third-party release. App.1575 (". . . the valuation of third-party claims is uncertain and highly speculative."). Yet, despite the lack of valuation of the individual victims' claims, a Plan proponent submitted a declaration from a plaintiff's lawyer asserting that "the threat of liability for at least some members of the [Sackler] family was real and that, without the protections of bankruptcy, individual family members were at risk of *substantial judgments* against them." App.2041 (emphasis added).

It is no answer to say that these victims of the opioid crisis can receive compensation through the Plan for their claims against Purdue. Purdue settled its substantial estate claims against the Sackler Family, which for avoidable transfers alone assertedly exceeded $11 billion.

App.558-568.  As the bankruptcy court acknowledged, the estate's claims were settled for the benefit of the Debtors' creditors, App.558.  These settlement proceeds thus pay creditors in satisfaction of claims they hold against the Debtors.  They do not compensate individual opioid victims for their independent causes of action against the Sackler Family and other non-debtors.

Further, no one contends that personal injury claimants will be fully compensated for their losses through the Plan.  Even if a person's claims against Purdue and their separate claims against non-debtors are based on the same losses, the claims themselves are separate property.  Yet no consideration is being given based on the value of those claims against the Sackler Family and other non-debtors, even though they are distinct property taken without consent.

Under the Plan, the non-debtor victims receive limited value for their claims against Purdue and nothing for their claims against the Sackler Family.  The Sackler Family's full-throated demand for involuntary releases (for them and hundreds, potentially thousands, of cohorts) makes all too clear that the extinguishment of these causes of action has value.

**B.** **The Bankruptcy Clause does not authorize taking opioid victims' independent non-bankruptcy claims against the Sackler Family and other non-debtors.**

Because the elimination of direct causes of action held by non-debtor victims against other non-debtors involves non-bankruptcy claims, it also falls outside the powers conferred by the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4.

"Congress' power under the Bankruptcy Clause 'contemplate[s] an adjustment of a failing debtor's obligations.'"  *Ry. Lab. Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quoting *Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi. R.I. & P. Ry. Co*., 294 U.S. 648, 673 (1935)).  It thus permits bankruptcy courts to approve settlements between debtors and those who have liability to them, such as a settlement between Purdue and the Sackler Family requiring the Sackler Family to make payments to the estate.

But extinguishing direct claims by non-debtors against other non-debtors falls outside of this power because it adjusts a non-debtor's obligations—not those of the debtor in the case.

31

While Congress may, under the Bankruptcy Clause, authorize courts to issue "ancillary" orders to enforce the courts' "in rem" adjudications, *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 370 (2006), the involuntary Non-Debtor releases here do not do so.

The Non-Debtor releases are not limited to claims that would impact the res of Purdue's bankruptcy estate.  The bankruptcy court found, at most, that *some* claims against *some* defendants affected by the release *potentially* raised indemnification issues, that *some* claims affected shared insurance, and that *some* claims overlapped with Purdue's own claims against the Sacklers and others.  App.598.  Even assuming that were true, and even assuming all of these circumstances necessarily impact the res of the estate—which the government does not concede—the bankruptcy court never found that *all* potential claims affected by the release satisfied one or more of these conditions.  Nor could the bankruptcy court plausibly have done so, given the sheer breadth of the release and its extension to unborn persons and others.  And while the rationale of the bankruptcy court's decision appears to acknowledge that the releases should be limited to actions that have a direct impact on Purdue's property, no corresponding limitation is found in the terms of the Non-Debtor releases.[8]

In fact, there were direct actions available against the Sackler Family and other non-debtors for their affirmative part in the opioid crisis, as explained in section III.C.2, *infra*, and Purdue's insurers had either declined coverage for opioid-related liability or reserved their rights to do so.  App.3222-3225; Dkt. 3456 at 17.  Thus, the Plan terminated claims that did not impact Purdue's estate property.  As a result, the Plan's Non-Debtor releases extend to claims that the

---

[8]  The Second Circuit has expressly held that bankruptcy courts may not "enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtor's estate." *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008) ("*Manville III*"), *rev'd and remanded on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009).

bankruptcy court could not have constitutionally adjudicated, nor had jurisdiction to do so,[9] and it should not have been approved.

### C.     The bankruptcy court lacked constitutional authority to extinguish the non-debtors' claims against the Sackler Family and other non-debtors.

Under Supreme Court precedent, bankruptcy judges as non-Article III judges do not have constitutional authority to enter a final judgment on state law claims between private parties absent all parties' knowing and informed consent. *Stern*, 564 U.S. at 482, 493; *In re Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015). As the Court explained in *Stern*, "[w]hen a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,'. . . and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." 564 U.S. at 484 (quoting *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring)).

The Court set out the test for determining when a bankruptcy court has constitutional authority to enter final judgment on a claim in *Stern*: "Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."[10]   564 U.S. at 499. In *Stern*, because the debtor's tortious

---

[9]  With respect to non-debtor releases, the Second Circuit has recognized that "related-to" jurisdiction does not extend to disputes between third parties that are based on the parties' independent conduct and that do not implicate the property of the estate—even if the factual predicate of those claims related to the debtor. *Manville III*, 517 F.3d at 56. Thus, "a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that *directly affect* the res of the bankruptcy estate." *Id.* at 66 (emphasis added). As the party seeking to establish the bankruptcy court's subject matter jurisdiction, it was Purdue's burden to show that a direct effect on the estate's property was present as to each and every third-party claim extinguished by the Plan. *See Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002) (party asserting subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that it exists"). That burden was not met here.

[10] The Bankruptcy Code provides procedures for the allowance or disallowance of creditors' claims and claims for reimbursement of the bankruptcy estate's administrative expenses. 11 U.S.C. §§ 501-503.

interference counterclaim neither stemmed from the bankruptcy nor would necessarily be resolved in the claims allowance process, the Court held the bankruptcy court had no constitutional authority to adjudicate it. *Id*.

The releases of third-parties' state law claims against the Sackler Family and others "involve the most prototypical exercise of judicial power, the entry of a final, binding judgment by a court . . . on a common law cause of action." *Stern*, 564 U.S. at 494. A "release" of a particular claim operates as a judgment that extinguishes the released claim as a matter of law with the same res judicata effect as a judgment on the merits of that claim. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151-54 (2009); *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) (holding that plan confirmation order containing releases of claims against third parties constituted final judgment on those claims). A court that lacks authority to adjudicate a claim also lacks the authority to enter a final judgment releasing it.

Applying the *Stern* test, the bankruptcy court, as an Article I court, lacked constitutional authority to confirm the Plan forever barring non-debtor opioid victims from bringing direct state law claims against the Sackler Family and other non-debtors. The released claims involve rights defined by state law against non-debtor, private parties that arise independently of the Debtors' bankruptcy filing. Thus, they do not "stem from the bankruptcy itself." Nor would they "necessarily" be resolved in the Code's allowance process because that process is solely for claims against the Debtors' estate. *See* 11 U.S.C. § 501-503. Accordingly, only an Article III court may finally resolve these claims, and the bankruptcy court lacked constitutional authority to release them.

Even as to non-opioid claims excluded from the release, App.1100, the Confirmation Order exceeds the bankruptcy judge's constitutional authority by empowering him to enter a judgment barring those claims. The Plan precludes any "Person" from litigating such a claim in an Article III court without first obtaining leave of the bankruptcy court. App.1217. The Plan thus establishes a perpetual, post-confirmation gate-keeping role for the bankruptcy court before anyone—even those who are not Purdue's creditors, *see* App.1102 (defining "Person")—may

34

assert an excluded non-opioid claim against released non-debtors.  App.1217.  If the bankruptcy court determines that such a claim cannot proceed, that disposes of the claim.[11]

The bankruptcy court incorrectly held that because a confirmation proceeding is a "central aspect of a Chapter 11 case's adjustment of the debtor/creditor relationship," imposition of non-debtor releases contained in a plan is "not only [ ] a core proceeding under 28 U.S.C. § 157(b), but also . . . 'constitutionally core' under [*Stern*]."  App.603.  Under the bankruptcy court's interpretation of *Stern*, Article III imposes no limitation on bankruptcy courts' powers to confirm a plan and no restriction on bankruptcy courts' ability to resolve disputes between private parties through a plan.  In reaching that conclusion, the bankruptcy court failed to apply the test articulated in *Stern*.  As *Stern* made clear, the constitutional analysis must focus on the content of the proceeding, *i.e.*, the claims being adjudicated, not on the category of the proceeding as "core."  Thus, the bankruptcy court lacks constitutional authority to extinguish common law claims between non-debtors through plan confirmation or otherwise.

The bankruptcy court's view of *Stern's* test departs from *Stern's* plain language and would give bankruptcy courts virtually limitless authority to adjudicate claims reserved to Article III courts in the context of plans.  *Stern* does not authorize Congress to strip parties who wish to contest matters of private right of their constitutional right to an Article III adjudicator.  *Cf. Granfinanciera, S.A. v. Nordberg*, 392 U.S. 33, 51 (1989) ("Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders.  But it lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.") (footnote omitted).  Nor does it authorize bankruptcy courts to adjudicate claims reserved to Article III judges merely because they are raised in the context of a plan.  Rather, *Stern* makes clear that the judicial power may not be exercised outside of Article III.  *See Stern*, 564 U.S. at 502 ("Is there really a threat to the separation of powers where Congress has

---

[11] Appellees have argued that the released claims are not extinguished but channeled to the trusts.  For the reasons set forth *supra*, that is incorrect.

conferred the judicial power outside Article III only over certain counterclaims in bankruptcy? The short but emphatic answer is yes.").

In reaching its decision, the bankruptcy court relied on *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 136 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020).  Contrary to the plain language of *Stern* and other courts of appeals' understanding of *Stern*, *Millennium Lab* held that the bankruptcy court was permitted to confirm the plan "because the existence of the releases and injunctions was integral to the restructuring of the debtor-creditor relationship."  945 F.3d at 126 (quoting *Stern*, 564 U.S at 497).  The Third Circuit seized upon a statement in *Stern* explaining that "a preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because then the ensuing preference action by the trustee becomes integral to the restructuring of the debtor-creditor relationship."  *Stern*, 564 U.S. at 497 (cleaned up).  But the bankruptcy court's constitutional authority to resolve a preference claim in adjudicating the creditor's proof of claim against the debtor's estate does not translate to authority for a non-Article III court to adjudicate private, state law claims between non-debtors.

Similarly, the bankruptcy court's reliance on *Quigley* was misplaced.  *Quigley* concerned a temporary stay of litigation rather than the permanent disposition of claims.  676 F.3d at 52 ("Enjoining litigation to protect bankruptcy estates *during the pendency of* bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts.") (emphasis added).  *Quigley* thus did not address the constitutional authority of a bankruptcy court to issue a permanent injunction of third-party actions.

Because the Non-Debtor releases extinguish state law claims between private parties that are not resolved by a ruling on their claims against the Debtors, the bankruptcy court lacked constitutional authority to confirm the Plan.  As then-Judge Gorsuch explained:

> [*Stern*] held that when a "claim is a state law action . . . *and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy*," it

implicates private rights and thus is not amenable to final resolution in bankruptcy court. . . . *Indeed, the Court repeated this point—repeatedly.*

*Loveridge v. Hall (In re Renewable Energy Dev. Corp.)*, 792 F.3d 1274, 1279 (10th Cir. 2015), *as amended on denial of reh'g* (July 28, 2015) (Gorsuch, J.) (emphasis added).

Other circuit courts of appeal agree. *In re Glob. Technovations Inc.*, 694 F.3d 705, 722 (6th Cir. 2012) (describing *Stern's* holding as "[w]hen a claim is 'a state law action independent of the federal bankruptcy law and *not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy*,' the bankruptcy court cannot enter final judgment") (emphasis added) (quoting *Stern*, 564 U.S. at 487)); *In re Fisher Island Invs., Inc.*, 778 F.3d 1172, 1192 (11th Cir. 2015) (holding that bankruptcy court had constitutional authority to enter final judgment where the claim "was 'necessarily resolve[d]' by the bankruptcy court through the process of adjudicating the creditors' claims" (citation omitted)); *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 564-65 (9th Cir. 2012) (holding that bankruptcy court lacked constitutional authority to enter final judgment because the claim at issue "need not necessarily have been resolved in the course of allowing or disallowing the claims against the . . . estate"), *aff'd, Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014). *But see In re Ortiz*, 665 F.3d 906, 911, 914 (7th Cir. 2011) ("Non-Article III judges may hear cases when the claim arises as part of the process of allowance and disallowance of claims, . . . or when the claim becomes integral to the restructuring of the debtor-creditor relationship.") (internal quotation omitted).

The bankruptcy court also relied on this Court's decision in *In re Kirwan Offs. S.a.r.l.*, 592 B.R. 489, 504 (S.D.N.Y. 2018), *aff'd on other grounds sub nom. In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019). *Kirwan*, like *Millenium Lab*, focuses on whether the release of claims is "absolutely necessary to the operation of [the debtor's] reorganization plan" instead of the nature of the claims being released. 592 B.R. at 511. This Court concluded that the claims

37

released in *Kirwan* were not adjudicated but were preempted by the Bankruptcy Code because they stood as an obstacle to the accomplishment of the debtor's reorganization. *Id*. at 511-12.[12]

But *Kirwan's* preemption ruling was not necessary to its holding because this Court held in the alternative that the debtor had consented to the bankruptcy court's exercise of adjudicatory authority. 592 B.R. at 512. On appeal, the Second Circuit reserved the issue of whether bankruptcy courts may constitutionally enter final judgment on non-debtor releases. *Kirwan*, 792 F. App'x at 103 (affirming on basis of implied consent to court authority). The government respectfully submits that the bankruptcy court lacked that authority.

## II.    The bankruptcy relief bestowed upon the Sackler Family and other non-debtors violates the Bankruptcy Code.

### A.    The Bankruptcy Code does not authorize extinguishing non-debtors' claims against non-debtors in non-asbestos cases.

"As a general rule, a bankruptcy court has no power to say what happens to property that belongs to a third party, even if that third party is a creditor or otherwise is a party in interest." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019) (citation omitted) (noting the extraordinary nature of non-debtor releases). The Code specifies that "[a] discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Rather, the Code provides only for a discharge of the debtor's liabilities. 11 U.S.C. §§ 524(a), 1141(d)(1)(A).

Congress authorized bankruptcy courts to impose non-debtor releases only under section 524(g)'s one narrow circumstance—and that applies exclusively to asbestos cases. *See*, *e.g.*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142-43 (2d Cir. 2005) (recognizing that while

---

[12] The burden of establishing obstacle preemption is heavy, even more so when the federal and state laws serve different purposes. *In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013). That burden is not satisfied here. Chapter 11's goal of facilitating debtors' reorganizations does "not establish that Congress had a 'clear and manifest intent' to preempt" all third-party state tort causes of action against non-debtors that might impinge upon a debtor's ability to confirm a plan on preferred terms. *Id*. at 103 (quoting *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 249 (2d Cir. 2006)).

some cases have allowed such releases, "the only explicit authorization in the Code for nondebtor releases is 11 U.S.C. § 524(g)").  Section 524(g) authorizes bankruptcy courts to enjoin actions against a limited subset of identified third parties where the debtor establishes trusts for asbestos claimants to which their claims can be channeled and compensated, and only to the extent the third party is liable "by reasons of" one of four statutory relationships between the third party and the debtor.  11 U.S.C. § 524(g)(2)(B)(i) & (4)(A)(ii); *Travelers*, 557 U.S. at 155; *see also* section II.C.4 *infra* as to further distinctions from 11 U.S.C. § 524(g).  The Non-Debtor releases qualify under none of them.

Because Congress expressly authorized only this one exception, courts may not create others.[13]  *Cf. Law v. Siegel*, 571 U.S. 415, 424 (2014) ("The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions."); *accord Czyzewski v. Jevic Holdings Corp*., 137 S. Ct. 973, 987 (2017).

Instead, the Fifth, Ninth, and Tenth Circuits have held that the Bankruptcy Code "prohibits the discharge of debts of nondebtors."  *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995); *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995); *accord In re We. Real Estate Fund Inc*., 922 F.2d 592, 600 (10th Cir. 1990) ("Obviously, it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders."); *but see Blixseth v. Credit*

---

[13]  Section 111(b) Bankruptcy Reform Act of 1994, which added section 524(g), included a rule of construction.  108 Stat. 4117 (1994).  This rule provides that "[n]othing in [the subsection adding 11 U.S.C. § 524(g) to the Bankruptcy Code] shall be construed to modify, impair or supercede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization."  *Id*.  The most reasonable interpretation of this rule is that Congress wanted to protect reliance interests and to provide certainty to the Manville and other asbestos trusts established under the Manville model before the 1994 legislative amendment, and it is not an endorsement of channeling injunctions in other contexts.  *See* Asbestos Injury Compensation, GAO Report No. 11-819, p.8 ("Lingering concerns as to whether the injunction issued as part of [Manville's] plan could withstand all challenges underscored the 1994 amendment modeled after this approach.").

*Suisse*, 961 F.3d 1074, 1084-85 (9th Cir. 2020) (holding 11 U.S.C. § 524(e) did not preclude approval of exculpation clause).

Because section 524 is the specific provision addressing third-party releases, and the Non-Debtor releases do not qualify under it, the releases here violate the Code. The Supreme Court has explained that a general authorization may not be read to swallow a "more limited, specific authorization" in the Bankruptcy Code. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46, 649 (2012). Given section 524's specific language on releases and discharges, section 105(a) cannot be used to approve releases section 524 does not authorize. *See Law*, 571 U.S. at 424.

Section 105(a) authorizes courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). But "[a]ny power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code." *Metromedia*, 416 F.3d at 142 (internal quotation marks omitted). The Third Circuit has similarly questioned the use of section 105 as authority for non-debtor releases. *In re Cont'l Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) (explaining that section 105(a) "does not create substantive rights that would otherwise be unavailable under the Bankruptcy Code.") (quotation marks and citation omitted).

Nor can the power to impose non-debtor releases outside of section 524(g) come from section 1123(b)(6). That section provides only that a "plan may . . . include any other appropriate provision *not inconsistent with* the applicable provisions of this title." 11 U.S.C. § 1123(b)(6) (emphasis added). But a non-debtor release is inconsistent with other provisions of the Bankruptcy Code, including: section 524(a), which provides only for the discharge of the debtor; section 524(e), which provides that the discharge of the debtor "does not affect the liability of any other entity on, or the property of any other entity for, such debt;" and section 524(g), which defines the limited asbestos-related circumstances when releases are permitted.

It is also inconsistent with 11 U.S.C. § 523, which would not allow the individual non-debtors to be discharged—if they had filed for bankruptcy relief—from certain claims against

them that the Plan terminates, *see* section II.B, *infra*.  Thus, section 1123(b)(6) cannot be read to permit the Plan's extinguishment of claims against the Sackler Family and other non-debtors.

Put simply, only section 524 addresses releases, and it does not authorize the releases imposed here.  This means they were rendered in violation of the Bankruptcy Code, which in turn renders the Plan unconfirmable.  *See* 11 U.S.C. § 1129(a)(1).  Section 1129(a)(1) expressly prohibits confirmation of a plan that does not comply with "applicable provisions" of the Bankruptcy Code.  And section 1141(d), which specifies the scope of discharge upon confirmation, does not include non-debtors.

> **B.**     **The Plan grants the Sackler Family and other non-debtors greater relief than they could lawfully obtain if they became debtors and obtained a bankruptcy discharge.**

Under the Plan, the Sackler Family effectively bought hundreds of individual discharges for their role in the opioid crisis without actually filing for bankruptcy relief and subjecting themselves to the same rules of transparency and creditor protections that every consumer and business debtor who files bankruptcy must follow.  *See* 11 U.S.C. § 521(a); *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (noting that "full disclosure by debtors is essential to the proper functioning of the bankruptcy system").

Additionally, debtors entitled to bankruptcy relief must commit all of their assets to their estate.  11 U.S.C. §§ 541(a), 542.  But Purdue admits that the Sackler Family retained most of their sizeable $11 billion fortune in insisting upon their bespoke bankruptcy discharge.  App.1402; App.1404-1405; App.1563.  And their payments are spread out over a ten-year period, *see* App.980, during which their remaining sizeable assets may continue to accrue in value.

This turns the Bankruptcy Code on its head.  Had the individual Sackler Family members become chapter 11 debtors, they would have failed the statutory liquidation test under 11 U.S.C. § 1129(a)(7), which requires that creditors not getting the full value of their claim get at least the value equal to what they would get if the debtor were liquidated.  *See* 7 Collier on Bankruptcy

41

¶ 1129.02 (16th 2021).  The Plan also allows the Sackler Family members to discharge debts that individual debtors may not.  The Bankruptcy Code expressly prohibits an individual's discharge of debts for fraud, breach of fiduciary duty, and willful and malicious injury.  *See* 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6).  The Sacklers avoid this substantive prohibition by not filing bankruptcy themselves.  Instead, the Plan enjoins any actions against the individual Sackler Family members if Purdue's conduct is a "legally relevant" factor.  App.1201; *see also* App.2128 (objector arguing that the Non-Debtor release improperly prohibits his lawsuit for fraud against Sackler Family members from proceeding).

### C.   Second Circuit precedent does not authorize the extinguishment of these claims.

#### 1.   Direct vs. derivative claims

The United States Trustee does not concede that the distinction between direct and derivative claims impacts his arguments on appeal.  Nevertheless, because the bankruptcy court has relied on this distinction in its analysis, App.614-615, it is important to clarify the relevant definitions.  As explained below, Second Circuit precedent does not permit the Debtors to settle the direct claims of non-debtors against the Sackler Family and other non-debtors for their individual misconduct that caused direct injury to those victims.

"[S]o-called 'derivative claims'—i.e., claims 'based on rights "derivative" of, or "derived" from, the debtor's own claims'—typically constitute "property of the estate."'"  *In re Tronox Inc.*, 855 F.3d 84, 99 (2d Cir. 2017) (quoting *In re Bernard L. Madoff Inv. Secs. LLC*, 740 F.3d 81, 88 (2d Cir. 2014) ("*Madoff*")).  "'Derivative claims' in the bankruptcy context are those that 'arise[ ] from harm done to the estate' and that 'seek [ ] relief against third parties that pushed the debtor into bankruptcy.'"  *Id.* (quoting *Madoff*, 740 F.3d at 89).  Thus, for example, a claim based on the fraudulent conveyance of assets from the debtor to a third party is one that properly belongs to the estate.  *Id.* at 100 (discussing *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)); *see also Madoff*, 740 F.3d at 91 (noting a "fraudulent

transfer claim is perhaps the paradigmatic example of a claim that is 'general' to all creditors")
(citation omitted).

"Whereas a derivative injury 'is based upon "a secondary effect from harm done to [the
debtor]," an injury is said to be "particularized" when it can be "directly traced to [the third
party's] conduct."'" *Tronox*, 855 F.3d at 100 (quoting *Madoff*, 740 F.3d at 89).  Two contrasting
Second Circuit opinions from the Johns-Manville bankruptcy are illustrative.

Manville was an asbestos manufacturer and supplier.  *Manville III*, 517 F.3d at 56.
During its bankruptcy case, Manville settled with its insurers for $770 million in exchange for a
"full and final release of Manville-related claims."  *Id.* at 56-57.  One of Manville's distributors
challenged the release, claiming it had a right to recover against the insurer as it was coinsured
under the policy.  *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837
F.2d 89 (2d Cir. 1988) ("*Manville I*").  The Second Circuit rejected this claim, holding that the
claim was "derivative" of Manville's because it sought recovery "out of the proceeds of
Manville's insurance policies on the basis of Manville's conduct."  *Id.* at 92-93.

By contrast, the Second Circuit held that claims brought by asbestos victims against the
same insurer based on allegations of the insurer's own misconduct were *not* derivative.  *Manville
III*, 855 F.3d at 68.  Those victims had brought statutory and common law claims against the
insurer for, among other things, acquiring knowledge of the dangers of asbestos and
"influenc[ing] Manville's purported failure to disclose knowledge about asbestos hazards."  *Id.* at
58.  As the Second Circuit held, it did not matter whether the liability arose from the same
factual nexus as the claims against Manville; the inquiry was whether the insurer "owe[d] a duty
[to the plaintiffs] independent of its contractual obligations to indemnify those injured by the
tortious conduct of Manville."  *Id.* at 67.

Although the Supreme Court reversed and remanded, it did not address this part of
*Manville III*'s analysis.  *Travelers Indem. Co.*, 557 U.S. at 155.  Rather, the Supreme Court
determined that the bankruptcy court had, in fact, enjoined the non-derivative, direct actions in a
prior order that had not been appealed and thus was not subject to collateral attack.  *Id.*  The

Court expressly reserved judgment on whether a bankruptcy court "could properly enjoin claims against nondebtor insurers that are not derivative of the debtor's wrongdoing." *Id.*  And, as noted by Justice Ginsburg in her dissent, interpreting the injunction to bar "only those claims against Manville's insurers seeking to recover from the bankruptcy estate for Manville's misconduct, not those claims seeking to recover against the insurers for their own misconduct . . . respects the limits of the Bankruptcy Court's power." *Id.* at 156 (Ginsburg, J., dissenting).

The Second Circuit has subsequently reiterated that a creditor's independent claim can arise out of the same set of facts as that of a debtor's claim. *Madoff*, 740 F.3d at 91.  It explained that "there is nothing illogical or contradictory about saying that [a third-party defendant] might have inflicted direct injuries on both the [estate's creditors] and [the debtor estate] during the course of dealings that form the backdrop of both sets of claims." *Id.* (citing *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 587 (5th Cir. 2008)).  The claim is only derivative if the creditor's "alleged injuries are inseparable from, and predicated upon, a legal injury *to the estate*. . . ." *Id.* at 92 (emphasis added) (holding claim for fraudulent withdrawals from debtor was estate claim and not particularized to creditor).  Or, if the "alleged liability" of the non-debtor "arises not from its own conduct, but from its alleged existence as the alter ego and successor to the liabilities of" its predecessor-in-interest, then that claim is derivative.  *Tronox*, 855 F.3d at 88, 106-07 (expressly holding that plaintiffs had failed to allege personal misconduct by the non-debtor defendant).

Analyzed another way, if the creditor's claim is one that a bankruptcy trustee could bring on behalf of the estate, then it is derivative. *Madoff*, 40 F.3d at 90; *Tronox*, 855 F.3d at 101.  If the trustee cannot, then the claim is direct. *Id.*  Thus, the Second Circuit held that a trustee could not assert claims against third-party financial institutions on behalf of the debtor's customer-creditors for aiding and abetting fraud; those were injuries that "independently caused harm to individual creditors" and thus were owned by the debtor's customers, rather than by the debtor. *Tronox*, 855 F.3d at 101(citing *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 71 (2d Cir. 2013)).

44

Second Circuit precedent does not permit the bankruptcy court to immunize the Sackler

Family and other non-debtors from civil liability for individual misconduct that caused direct

injury to creditors.  Those claims were not Purdue's to settle.

### 2. The Plan terminates non-debtors' direct claims against the Sackler Family and other non-debtors.

Here, hundreds of lawsuits were brought against the Sackler Family and other non-

debtors.  *See*, *e.g.*, App.2401-2597.  Numerous claims, including the civil claims brought by the

federal and state governments against certain Sackler Family members, alleged that certain of

those individuals had engaged in misconduct.  App.1343-1373; App.2040 (declaring that, after

discovery, plaintiff's counsel had a "good faith basis to sue several members of the Sackler

family"); App.2598-2660 (Connecticut complaint); App.2661-2774 (Delaware complaint);

App.2775-3152 (Massachusetts complaint); 3153-3196 (Rhode Island complaint).  "These

claims include, but are not limited to, product liability, wrongful death, negligence, including

negligent misrepresentation, negligence per se and gross negligence, fraud, fraudulent

concealment, deceit and other willful misconduct, unjust enrichment, public nuisance, and claims

under state consumer protection and controlled substances laws."  App.1573.

As a general matter, corporate officers and directors are personally and directly liable for

both common law and statutory torts that they authorize, direct, or participate in, even if they

acted as an agent of the corporation.  *See*, *e.g.*, *Joseph Gen. Contracting, Inc. v. Couto*, 119 A.3d

570, 583, 585, 586 n.11 (Conn. 2015) (collecting cases); *see also Commonwealth v. Purdue

Pharma, L.P.*, No. 1884CV01808, 2019 WL 6497887, at *2 (Mass. Super. Nov. 6, 2019); *Galas

v. Lending Co*., No. 12-01265, 2013 WL 308745, at *3 (D. Ariz. Jan. 25, 2013); *In re Glo-Tex

Intern.*, No. 07-06449, 2010 WL 4916574, at *4 (Bankr. D.S.C. Nov. 30, 2010); *Corbett v.

Manson*, 903 A.2d 69, 73 (Pa. Cmwlth. 2006).

Thus, other courts have upheld their jurisdiction over, or declined to dismiss complaints

against, individual Sackler Family member defendants, not because they were officers or

directors of Purdue, but because the allegations in the complaint reflected the individuals'

"'direct personal involvement' in conduct that 'is causally related to the plaintiff's injury. . . .'" *Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808, 2019 WL 5617817, at *4 (Mass. Super. Oct. 8, 2019) (quoting *Hebb v. Greens Worldwide, Inc.*, No. 06-4368, 2007 WL 2935811, at *4 (Mass. Super. Sept. 17, 2007)).[14] *See also In re Opioid Litig.*, Index No. 400000/2017, 2019 N.Y. Misc. LEXIS 3324, at *21-22 (N.Y. Sup. Ct. June 21, 2019) ("Under New York law . . . a director may be held individually liable for a corporate tort if he or she participated in its commission or else directed, controlled, approved or ratified the decision that led to the plaintiff's injury; this is so regardless of whether he or she acted on behalf of the corporation in the course of official duties and regardless of whether the corporate veil is pierced"); *State v. Purdue Pharma L.P.*, No. PC-2018-4555, 2019 R.I. Super. LEXIS 95, at *17 (Super. Ct. Aug. 16, 2019) (denying motion to dismiss complaint against Richard Sackler based upon allegations of personal misconduct).

In the Massachusetts case, for example, after refusing to dismiss on jurisdictional grounds, the court denied the Purdue directors' motion to dismiss for failure to state a claim for violation of the state consumer protection law. *Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808, 2019 WL 6497887, at *2 (Mass. Super. Nov. 6, 2019). The complaint alleged that Purdue's directors, including members of the Sackler family, "repeatedly approved policies and tactics intended to aggressively promote opioid sales even though they knew that these policies and tactics were contributing to an epidemic of addiction, overdose and death." *Id*. The court found that these allegations sufficiently alleged that the directors personally participated in the wrongdoing. *Id*. at *3.

---

[14] While Massachusetts ultimately consented to the Non-Debtor release, both the causes of action it brought—violation of a state consumer protection law, Mass. Gen. Laws ch. 93A, and public nuisance—and the supporting factual allegations it made may equally be raised by others. *See id.* at § 9 (granting cause of action to "any person" injured by the deceptive practice). So too for the claims brought by New York, which included deceptive business practices, public nuisance, fraud, unjust enrichment, and negligence. *See* 2019 2019 N.Y. Misc. LEXIS 3324 at *22-35; *see also* N.Y. Gen. Bus. Law § 349(h) (providing for private right of action).

Individual and non-governmental plaintiffs have also sued Sackler Family members and other released non-debtors for their tortious conduct.  *See Purdue*, Adv. No. 19-08289, Dkt. 287, 291.  The following are three such examples that the Plan would terminate.[15]

*Hickey v. Purdue Pharma, et al.*, Case No. 19-11806, Dkt. 1 (D. Mass. filed Aug. 22, 2019), was expressly included in the bankruptcy court's preliminary injunction, *Purdue* Adv. No. 19-08289, Dkt. 291 at 120.  Like the Massachusetts government's complaint above, Mr. Hickey alleged, *inter alia*, unfair and deceptive acts in violation of the state consumer protection law because "[m]embers of the Sackler Family and other Purdue Executives purposefully downplayed the addictive properties of OxyContin and promoted sales tactics meant to encourage doctors to prescribe as much OxyContin, in the highest doses and longest duration as possible—despite the potential risk of abuse . . . ."  *Hickey* Dkt. 1 ¶ 3; *see also id.* at ¶¶ 6, 7.

*Hartman v. Sackler*, Case No. 21-02001, Dkt. 1 (E.D. Pa. filed Apr. 30, 2021), is a putative class action against members of the Sackler Family and other individuals, but not against Purdue.  Mr. Hartman alleged two causes of action: one for misrepresentation under 402A Restatement (Second) of Torts, the other under the Pennsylvania Unfair Trade Practices Act, 73 P.S. § 201-2(4).  Compl. ¶¶ 92-99.  Directors and officers can be held directly liable for their conduct under the Pennsylvania Unfair Trade Practices Act.  *See Corbett*, 903 A.2d at 71, 75 (affirming liability of CEO under the Act where "[the CEO] was a 'very hands-on owner,' was 'involved in certainly all of the important decisions,' and, as time went on, 'really got involved much heavier and practically in every decision that was made for the company,' 'almost micro managing the business right down to the smallest detail'").

Not only does the bankruptcy court's most recent injunction order expressly apply to this case, *Purdue*, Adv. No. 19-08289, Dkt. 291 at 123, one of the defendants has asserted that the

---

[15]  *See also Heden v. Johnson & Johnson*, No. 19-00586 (D.R.I. filed Nov. 12, 2019); *Rhodes v. Rhodes Techs., Inc.*, No. 19-cv-00885 (M.D. Tenn. filed Oct. 5, 2019); *Tilley v. Purdue Pharma L.P.*, No. 19-00566 (S.D. W. Va. filed Aug. 2, 2019).  For the convenience of this Court, copies of the above-referenced individuals' complaints have been submitted by a motion for judicial notice concurrently filed with this brief.

Plan's releases would also apply to it.  *See Hartman*, Dkt. 6 (Aug. 30, 2021) (motion by defendant Mark Timney for an extension of time to answer "[i]n light of the releases in [Purdue's] pending bankruptcy plan which encompass this action. . . .").  Mr. Hartman later objected to the Plan based in part on "the extraordinarily broad nonconsensual third-party release of the Sackler Family and other non-debtors."  App.2128-2132.

And *Map to Health v. AmerisourceBergen Drug Corp.*, No. 21-45093, Dkt. 1 (N.D. Ohio filed July 15, 2021), is a putative class action by a treatment facility.[16]  Although it does not appear to have been served, the 317-page complaint against members of the Sackler Family and other former directors and officers of Purdue included detailed allegations of the "Sackler Defendants' micromanagement" and personal "active participat[ion]" in alleged wrongdoing, and asserted that because the defendants "directed and participated in" Purdue's tortious conduct, they are individually liable for negligence, nuisance, fraud, and under state deceptive trade statutes.  *See*, *e.g.*, Dkt.1 ¶¶ 72-80, 955, 973 995, 1027, 1079.  It further alleged violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"), based on an alleged association-in-fact "Sackler Pharmaceutical Enterprise," which was "owned, directed and controlled at all times by the Sackler Defendants."  *Id*. ¶¶ 907-17, 948-956.[17]

These complaints are just a few examples of the direct claims—not claims that belong to Purdue's bankruptcy estate that could have been brought by the estate—that were terminated by the Non-Debtor releases.  *See* section II.C.1, *supra*; *see also Glo-Tex Intern.*, 2010 WL 4916574,

---

[16] Although this complaint is not listed in the bankruptcy court's most recent (twenty-second amended) preliminary injunction order, *Purdue*, Adv. No. 19-08289, Dkt. 291, it was included in Purdue's Notice of Filing of the Proposed Twenty-Second Amended Preliminary Injunction Order, *id*. Dkt. 290, Ex. D at 158; *see also Mercy House Teen Challenge v. AmerisourceBergen Drug Corp.*, No. 18-46070, Dkt. 27 (N.D. Ohio filed Mar. 15, 2019) (including similar allegations); *Purdue*, Adv. No. 19-08289, Dkt. 1, Ex. C at 125 (listing *Mercy House* among the actions to be enjoined).

[17] Individuals can be directly liable under RICO even if they were also owners or officers of a corporation acting within the scope of their authority. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001)).

at *4-*5 (allowing creditors' pursuit of claims against debtor's former owners, despite former owners' settlement with trustee, where plaintiffs alleged that former owners directly participated in state law torts, which were direct, not derivative, claims).

Moreover, because of the nationwide preliminary injunction issued by the bankruptcy court below, no party was allowed to file any new litigation against the Sackler Family or related non-debtors since October 11, 2019, even if Purdue was not also named as a defendant. *Purdue*, Adv. Proc. No. 19-08289, Dkt. Nos. 82, 89, 105, 115, 126, 132, 139, 145, 168, 175, 185, 190, 194, 208, 214, 219, 241, 254, 264, 274, 286, and 287. And, of course, there was no process in Purdue's case to file a proof of claim against the Sackler Family—because they were not the Debtors. As the preliminary injunction has prevented parties from asserting claims against the Sackler Family (and related non-debtors) since 2019, the full universe of the claims against them remains unknown and uncounted.

But there have been dissenting voices that have made themselves heard against the Plan and its release of the Sackler Family and other non-debtors. These include the victims who objected to the Plan and the termination of their claims. App.2095-2098; App. 2099-2100; App.2101-2107; App.2108-2109; App.2110-2115; App.2116-2121; App.2122-2123; App.2124-2127; App.2128-2132; App.2374; *see also* App.2133-2161. They include state and local governments, insurers, and industry participants that also objected with similar concerns. Dkt. Nos. 3264, 3270, 3272, 3274, 3275, 3276, 3278, 3279, 3280, 3292, and 3306. They include the 2,683 personal injury victims who voted against the Plan, and may well include some, if not many, of the nearly 70,000 personal injury claimants who did not vote on the Plan at all. And they include the numerous other appellants, including eight states, the District of Columbia, Canadian municipalities, Canadian First Nations, and three pro se individuals that have appealed the Confirmation Order. Dkt. 3724 (as amended by Dkt. 3812); Dkt. 3725; Dkt. 3774; Dkt. 3775; Dkt. 3780 (as amended by Dkt. 3839); Dkt. 3784 (as amended by Dkt. 3818); Dkt. 3810; Dkt. 3813; Dkt. 3832; Dkt. 3849; Dkt. 3851; Dkt. 3853; Dkt. 3877; and Dkt. 3878.

To the extent the Plan proponents now maintain there are no claimants with direct claims against the Shareholder Released Parties, it was their burden to prove this before the bankruptcy court.  They made no attempt to do so before the Plan was confirmed.  And the bankruptcy court itself recognized that the Plan terminated creditors' direct causes of action.  App.614-615 ("If, in fact, [derivative] claims were the only claims to be released, we would not be talking about a 'third-party claims' release of the shareholder released parties."); App.615(A "true third-party release[]," such as the one approved here, involves "claims that are independent of the debtor's estate's claims at least on a legal basis, if not as a factual basis.").

### 3. *Metromedia* does not authorize the release of liabilities of the Sackler Family and other non-debtors.

*Metromedia* does not permit the Non-Debtor releases, notwithstanding its acknowledgement that *some* cases have tolerated non-debtor releases in "rare" circumstances despite the lack of explicit statutory authority for them.  *Metromedia*, 416 F.3d at 141-43.

First, the Second Circuit did not address the constitutional arguments raised here. *Metromedia*, 416 F.3d at 141-43.  Moreover, *Metromedia* dismissed the appeal as equitably moot,[18] *id*. at 143-45, rendering its statements regarding non-debtor releases dicta.  *See Kokkonen v. Guardian Life Ins. Co. of Am*., 511 U.S. 375, 379 (1994) ("It is to the holdings of our cases, rather than their dicta, that we must attend. . . ."); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 352 n.12 (2005) ("Dictum settles nothing, even in the court that utters it.").

Nor could the possibility of a "rare case" exception, as mentioned in *Metromedia*, 416 F.3d at 141, justify what happened here.  The Supreme Court's recent decision in *Jevic*, 137 S. Ct. at 986, underscores the problem with creating "rare" case exceptions to the Bankruptcy

---

[18]  Equitable mootness is a judge-made "prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented."  *Metromedia*, 416 F.3d at 144.  The government believes that it is inapplicable here and may run afoul of the Supreme Court's recent invalidation of similar prudential doctrines.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014); *see also In re VeroBlue Farms USA, Inc*., 6 F.4th 880 (8th Cir. 2021).

Code's requirements.  In *Jevic*, the Court rejected the argument that a proposed deviation from the Code's priorities of payment was acceptable if limited to the "rare case" and the court finds "sufficient reasons," because that would still require a "departure from the protections Congress granted particular classes of creditors."  *Id*. at 986-87.  The same is true here; allowing non-debtor releases departs from Congress's direction that only debtors may obtain a discharge through a bankruptcy case with a narrow exception only for asbestos cases.

As this case demonstrates, the difficulty of giving "precise content to the concept 'sufficient reasons' . . . threatens to turn a 'rare case' exception into a more general rule."  *Id*. at 986.  That threat is acute in the context of non-debtor releases, which have become increasingly common.  *See, e.g., Aegean Marine*, 599 B.R. at 723 (likening the increasingly common requests for third-party releases to "participation trophies").

Contrary to the lower court's broad reading of *Metromedia*, the Second Circuit specifically disapproved of the non-debtor releases at issue there.  416 F.3d at 143.  Among other things, it questioned both whether the release itself was necessary to the plan and separately whether the breadth of the release—which covered numerous third parties in addition to the party contributing funds—was also necessary to the plan.  *Id.*

It is not established that the Non-Debtor releases were necessary to reorganize Purdue. The Debtors' estates held claims against the Sackler Family that far exceeded the amount the Sackler Family agreed to pay under the Shareholder Settlement Agreement (to which the personal injury victims were not a party).  App.953.  Indeed, the bankruptcy court characterized the estates' claims as "argu[ably] . . . the main claims" against the Sackler Family. App.558-559. Estate claims for avoidable transfers alone assertedly exceeded $11 billion.  App.568.  To the extent Purdue or its creditors litigated Purdue's claims against the Sackler Family, rather than settled them in exchange for the unprecedentedly broad Non-Debtor releases, there may well have been enough to pay the unsecured creditors, including the personal injury claimants.  *See Jevic*, 137 S. Ct. at 983 (rejecting bankruptcy court's finding that without settlement, the

51

unsecured creditors would receive nothing, holding that "the mere possibility of failure does not eliminate the value of the claim or petitioners' injury in being unable to bring it").

*Metromedia* also stated that a non-debtor release may be permissible if "the plan otherwise provided for the full payment of the enjoined claims."  416 F.3d at 142.  It should not be lost that the coerced settlement does little for individual creditors.  The Plan calls for the disbursement of roughly $4 billion.  But the victims' portion is modest at best.  They receive only the present value of a $700 to 750 million payment stream that will be disbursed to them over ten years.  App.1402-03.  They will receive—at the very most—only $48,000, notwithstanding the death and misery they and their families have suffered.  And no value is being paid based on victims' claims against members of the Sackler Family or other non-debtors. *See* section I.A.4, *supra*.  Yet, at the end of the Plan, the Sackler Family will have shielded the bulk of their assets from their victims' reach.

And, unlike in the cases outside the Second Circuit described in *Metromedia* as permitting non-debtor releases, here they extend to persons far beyond those making contributions to the reorganization plan, and who would have no claim for indemnity or contribution against Purdue.  It is not even clear whether individual Sackler Family members are making any direct financial contributions to the estate, or if all of the money attributed to them comes from trusts.[19]  The Sackler Family attempts to use the trusts holding their wealth as both a

_____

[19] App.3234-3235 [Testimony of Mortimer Sackler ("Q Do you know how much of your own personal assets will be expended or is it all going to be covered by the trusts?  A Well, the -- a trust that I'm a beneficiary of that's for me, you know, is -- for me and my children and grandchildren is, in my view, is my contributing as well.  You know, in terms of how much ends up coming out of my personal estate versus my trust, I don't know at this time.")]; App.3226-3227 [Testimony of David Sackler ("Q Are you paying for any of the proposed Sackler payments under this confirmation plan and proposed settlement out of your own funds or personal assets?  A Trusts of which I'm a beneficiary are paying the settlement amounts.  Q Right.  And I guess that's the question I had.  Do you intend to pay for the Sackler payments out of the trusts of which you are a beneficiary but not directly out of your own personal assets?  A My, yeah, I believe that is the current plan but I'd have to refer to my counsel to be absolutely certain.")]; App.3229-3230 [Testimony of Richard Sackler ("Q Mr. Sackler, are you going to be personally contributing any of your own assets to the settlement payments over the next nine to ten years?  A I don't know -- I don't believe that's been decided yet.")].

sword and a shield: to claim on the one hand that these trusts are separate from them and thus cannot be reached by their creditors, App.2054, but also to claim credit for the trusts' contribution to the estate in exchange for vast Non-Debtor releases.

Contributions from the Sackler Family trusts cannot justify a release for the hundreds of other individuals and entities, including those alleged to have personally engaged in misconduct and who are not part of the Sackler Family.  Nor can they justify a release of the hundreds, if not thousands, of other released non-debtors who did not work for, or otherwise manage, Purdue, and thus could have no possibility of seeking contribution or indemnification against the Debtors.  App.1375 ("While approximately a dozen members of the Sackler Families served on the Board or were otherwise involved in Purdue Pharma's business to varying degrees, the record indicates that many members of the Sackler Families were not involved in Purdue Pharma at all, other than as passive recipients—through a series of intermediate entities and trusts—of distributions.").

As *Metromedia* warned, non-debtor releases lend themselves to abuse because they "may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code" and the "potential for abuse is heightened when releases afford blanket immunity."  416 F.3d at 142.  The Plan is emblematic of this sort of abuse.

### 4.      *Quigley* does not authorize the Non-Debtor releases.

Likewise, *Quigley*, on which bankruptcy court heavily relied, is irrelevant as it was an asbestos case that interpreted a statute, 11 U.S.C. § 524(g), that is inapplicable here.  And it did not address any of the constitutional challenges raised below.

*Quigley* applied the various procedural and substantive safeguards, including compensation, imposed by section 524(g).  Section 524(g) requires that: (1) the releasees are identifiable from the terms of the injunction; (2) they are "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor"; *and* (3) that liability must "arise by reason of" one of four "statutory relationships."  11 U.S.C. § 524(g)(4)(A)(ii); *In re*

*W.R. Grace Co.*, 13 F.4th 279 (3d Cir.2021).  Ultimately, *Quigley* held that the requirements of 524(g) were not met and the claims at issue against the debtor's parent—based on the use of the parent's name on the debtors' asbestos products—could *not* be enjoined because the alleged liability was not "by reason of" any of the four "statutory relationships."  *Quigley*, 676 F.3d at 49, 60-61.  *Quigley* simply cannot apply to the facts of this case.

Were this a section 524(g) action and had *Quigley* controlled, it would not have justified the bankruptcy court's extinguishment of the non-debtors' direct claims against other non-debtors.  Notably, *Quigley* concerned a temporary stay of litigation rather than the permanent disposition of claims.  *Id.* at 52.  *See also Zale Corp.*, 62 F.3d at 760-61 (distinguishing between propriety of temporary and permanent injunctions against third-party actions).

*Quigley* is also distinguishable because of the grounds for the bankruptcy court's in rem jurisdiction.  676 F.3d at 53.  There, the court found the third-party action at issue would impact the estate because the non-debtor shared insurance policies with the debtor and had an *uncontested* right to draw on that insurance for the lawsuit.  676 F.3d at 57.  But, here, no such uncontested rights exist.  Rather, the bankruptcy court below held that subject matter jurisdiction existed based on *potential* existence of indemnification and contribution rights.  App.593-598.[20]  Moreover, *Quigley* made clear that simply having jurisdiction to enjoin an action does not mean it would be appropriate to do so.  *Id.* at 58, n.14.

And even if section 524(g)'s provisions for asbestos cases somehow applied to this non-asbestos case—which they do not—its threshold requirements are not met here.  Among other reasons, aside from not being an asbestos case, the Plan precludes claims against *unidentified* non-debtors and is not limited to claims where liability is both based on the debtor's conduct *and* arises from one of the four statutory relationships to the debtor, 11 U.S.C. § 524(g)(4)(A)(ii), but

---

[20] As Purdue's advisor conceded, only a dozen (of the hundreds) of the Sackler Family members and other non-debtors were covered by insurance, and its insurers had either declined coverage for opioid-related liability or reserved their rights to do so.  App.3222-3225; Dkt. 3456 at 17.

extends to any claim for which a debtor's conduct is *either* a "legal cause" *or* "an otherwise legally relevant factor."[21]

In addition, although the bankruptcy court took the Plan's "legal cause" or "legally relevant factor" language from *Quigley*, the bankruptcy court miscites the opinion. App.616. *Quigley* held that to qualify for a statutory injunction under section 524(g), the defendant must not only be allegedly liable for the conduct of, or claims or demands against the debtor, but also "the liability sought to be imposed must arise as a legal consequence of one of the four enumerated *relationships*" under 11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV).[22]  676 F.3d at 60 (emphasis added).  The "*relationship*"—not the debtor's conduct—must be the "legal cause or a legally relevant factor for the liability."  676 F.3d at 60.  The mere fact that the parties had such a relationship is not sufficient to qualify under section 524(g).

Thus, *Quigley* rejected the parties' attempt to use section 524(g) to enjoin litigation that was based, not on the third-party's *relationship* to the debtor, but instead on the third-party's independent actions.  *Id.* at 62.  It similarly rejected a hypothetical in which a successor company to an asbestos concern might seek to enjoin a lawsuit against it for liability on an age discrimination suit.  *Id.* at 61.  It would be the company's discriminatory act, and not its position as successor, that led to the liability.  *Id.*; *see also Manville III*, 517 F.3d at 68 (holding section 524(g) was "not intended to reach non-derivative claims" such as for liability of the non-debtor's "own alleged misconduct").

As explained in section II.C.2, *supra*, victims have alleged that individuals immunized by the Non-Debtor releases personally engaged in tortious behavior that injured non-debtors. Although Purdue's conduct may—arguably—be "legally relevant" to such claims, that is

---

[21] Moreover, section 524(g) requires an abundance of other statutory protections not present here, such as super-majority voting requirements for current claimants and the appointment of a future claimants' representative.  *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), (g)(4)(B)(i).

[22] To paraphrase, the relationships are ownership, management, insurer, or financier.  11 U.S.C. § 524(g)(4)(A)(ii).  Each corresponds to "a previously-recognized relationship that may, in appropriate circumstances, give[ ] rise to the legal liability of one party for the conduct of or claims against another."  *Quigley*, 676 F.3d at 61.

irrelevant to the question of whether the bankruptcy court has authority to terminate them.  The bankruptcy court's attempt to enjoin victims' claims against the Sackler Family and other non-debtors for their own independent misconduct, simply because those claims may involve Purdue, is not supported by *Quigley.*

### 5.   No other binding Second Circuit opinion authorizes the Non-Debtor releases.

None of the other Second Circuit decisions mentioned by the bankruptcy court support its authority to issue the Non-Debtor releases.  App.615.  They are inapposite.

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285 (2d Cir. 1992), did not involve a chapter 11 plan confirmation.  Instead, it involved a settlement of a securities class action in which a class representative released claims on behalf of a certified class under Fed. R. Civ. P. 23.  *Id.* at 288.  Notably this was in the context of a mandatory, non-opt out class, *id.*, which under *Ortiz*, would be an improper treatment for mass tort victims.  *Ortiz*, 527 U.S. at 842-48.

As discussed above, *Manville I* involved the release of claims that were derivative of claims belonging to the debtor and that sought relief from insurance proceeds that were the debtor's property and part of its estate.  *Manville I*, 837 F.2d at 93 (approving injunction regarding disposition of debtor's insurance proceeds where plaintiffs' claims were "inseparable from Manville's own insurance coverage").  It does not support a bankruptcy court's authority to enjoin a creditor's direct claim against a non-debtor, as made amply clear by the holding of *Manville III*, 855 F.3d at 68.

*Madoff* similarly involved a release and injunction against claims that were derivative of the debtor's.  740 F.3d at 90-94.  There, the trustee had settled with certain defendants for fraudulent transfers, and the bankruptcy court enjoined any claims that were "duplicative or derivative of the claims brought by the Trustee."  *Id.* at 86.  Third parties then sought to sue the same debtors for the same fraudulent conveyance settled by the trustee.  *Id.* at 91.  The court carefully looked for any allegations of "particularized" actions by the defendants that were aimed

at the plaintiffs, such as through misrepresentations, and found none.  *Id.* at 91-93.  The court even noted that the plaintiffs may still amend the complaint to allege any "particularized conspiracy claim" that was not derivative of the debtor's.  *Id.* at 94.

And *Tronox* involved a final and unappealed release and injunction of claims that were duplicative or derivative of those settled in the debtor's bankruptcy case.  855 F.3d at 92.  There, third parties later tried to sue the settling defendants based on indirect-liability claims— fraudulent transfer actions and actions for alter-ego/successor liability—with no allegation that the settling defendant had breached a duty directly to the plaintiffs.  *Id.* at 105-06; *see also id.* at 88 (noting plaintiffs did not "alter their state-court complaint to allege direct claims against [the defendant] to hold it responsible for its own alleged wrongdoing").

These cases do not stand for the proposition that a bankruptcy court may ignore individuals' constitutional rights or extinguish non-debtors' direct claims against other non-debtors that are independent of the debtor's own claims and property.  To the extent this Court reads these Second Circuit decisions to permit this type of non-debtor release, they are wrongly decided for the reasons discussed in our brief.

## III.  Because the Non-Debtor releases are improper, the bankruptcy court abused its discretion in issuing the related orders.

The United States Trustee separately appealed two other orders related to the Confirmation Order: the Disclosure Order, App.647-945, and the Advance Order, App.1228-1233.  The Debtors proposed the disclosure statement as a condition precedent to soliciting acceptances of the Plan that was eventually confirmed (seven iterations later).  11 U.S.C. § 1125(b).  As both the Fifth and Ninth Circuits agree, the Disclosure Order is an interlocutory order that merged into the Confirmation Order for purposes of appeal.  *See Perez*, 30 F.3d at 1217; *Matter of Tex. Extrusion Corp.*, 844 F.2d at 115.  The government's objections to both the Disclosure Order and Advance Order pertained, in part, to their issuance under the incorrect premise that the Non-Debtor releases were authorized and permissible.  Dkt. 2686 at 18; Dkt. 3555 at 4-5.

For the reasons set forth above, the Non-Debtor releases are unconstitutional and violate the Bankruptcy Code.  It was an abuse of the bankruptcy court's discretion to (1) approve the disclosure statement and related solicitation materials in support of the Plan, and (2) approve the Advance Order to facilitate the illegal provisions of the Plan.  It was thus reversible error for the bankruptcy court to issue both the Disclosure Order and the Advance Order.

## CONCLUSION

For these reasons, the United States Trustee respectfully asks this Court to reverse the orders on appeal.

October 25, 2021

Respectfully submitted,

WILLIAM K. HARRINGTON
United States Trustee for Region 2


By /s/ Sumi Sakata
       Sumi Sakata
       Trial Attorney

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
WENDY COX
BETH A. LEVENE
WENDY COX
MELANIE D. HENDRY
SUMI K. SAKATA
Trial Attorneys

Department of Justice
Executive Office for
 United States Trustees
441 G Street, NW, Suite 6150
Washington, DC 20530
Tel: (202) 307-1399

WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
PAUL K. SCHWARTZBERG
BENJAMIN J. HIGGINS
BRIAN MASUMOTO
ANDREW VELEZ-RIVERA
Trial Attorneys

Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY 10014
Tel: (212) 510-0500

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume, type-face, and type-style limitations of Bankruptcy Rule 8015.

Under Rule 8015(f), "[b]y local rule or order in a particular case, a district court or BAP may accept documents that do not meet all the form requirements of this rule or the length limits set by" by the Part VIII of the bankruptcy rules.

Although Rule 8015(a)(7) sets a limit of 13,000 words, this Court has stated that the briefing in this appeal need not comply with the length-limits of Rule 8015. *See* 10/12/21 Tr. at 21 ("Please forget about the page limit . . . .").  This brief contains 20,416 words.

Under Section V.D of the "Individual Practices and Procedures [of] Chief Judge Colleen McMahon," this Court requires a type-face of 12-point serif font.  The foregoing complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 12-point font.


Dated: October 25, 2021

By /s/ <u>Sumi Sakata</u>
Sumi Sakata
Trial Attorney